No. 62,983

DOUGLAS SAMSEL, *Plaintiff*, v. WHEELER TRANSPORT SERVICES, INC., DON C. HILGENFELD, and GREAT WEST CASUALTY COMPANY, *Defendants.*

(789 P.2d 541)

Opinion filed March 21, 1990. (For original opinion filed March 30, 1989, see 244 Kan. 726, 771 P.2d 71.)

*Jerry R. Palmer*, of Palmer, Marquardt & Snyder, P.A., of Topeka, argued the cause and was on the briefs for the plaintiff.

*Edwin Dudley Smith*, of Fisher, Patterson, Sayler & Smith, of Topeka, and *Steve R. Fabert*, of the same firm, argued the cause and were on the briefs for the defendants.

*G. Gordon Atcheson*, of Shamberg, Johnson, Bergman & Morris, Chartered, of Overland Park, was on the brief *amicus curiae* for the Kansas Trial Lawyers Association.

The opinion of the court was delivered by

LOCKETT, J.: Chief Judge Earl E. O'Connor of the United States District Court for the District of Kansas has certified the following question for resolution pursuant to K.S.A. 60-3201: Does K.S.A. 1987 Supp. 60-19a01 violate the Kansas Constitution, including §§ 5 and 18 of the Kansas Bill of Rights?

The majority of our legislature voted to limit the traditional role of the jury to determine the monetary value for loss of the

quality of life in Kansas by setting a limit on the recovery of noneconomic damages. The majority of this court recognizes that the legislature's decision to modify the common law, by setting a limit on noneconomic damages, is a legislative decision that does not violate our state constitution.

Prior to discussing the certified question, however, we will review some of the findings contained in the following report: *Report of the Kansas Citizens Committee to Review Legal Liability Problems in Kansas as They Affect Insurance and Other Matters: Recommendations in the Area of Liability Insurance* (Oct. 17, 1986) (a report to Fletcher Bell, Kansas Commissioner of Insurance) (hereinafter *Citizens Committee Report*). This report provides important insights into the stormy controversy which currently surrounds the liability insurance and tort systems.

A great change in tort doctrine has taken place over the past century. The primary function of damages is no longer seen as deterrence or retribution for harm caused; damages are now seen as compensation. In large part, this shift has been caused by the modern availability of affordable liability insurance, the purchase of which has occasionally been required by legislation. See, *e.g.,* K.S.A. 40-3401 *et seq.* (the Health Care Provider Insurance Availability Act guarantees the availability of insurance to all Kansas physicians).

It is the availability of liability insurance which critics warn is threatened by the present tort system. If insurance goes, so will compensation to many plaintiffs, no matter how favorable the laws are in their favor. In reality, "[j]ustice is not achieved when deserved compensation is granted by a court; it is achieved when that compensation is paid to the plaintiff." *Citizens Committee Report* 52 (quoting Report of the Governor's Advisory Commission on Liability Insurance for the State of New York 121-29 [Apr. 1986]).

Insurance companies derive profits from two sources: underwriting revenues and investment income. Investment income fluctuations play an enormous part in premium cycles. "However, never before did interest rates have such a profound influence upon premiums as during the latest cycle when double digit interest rates provided insurance companies with a substantial

pool of funds available to use to increase market share by reducing premiums." *Citizens Committee Report* 33-34.

The insurance crisis of the 1970s, referred to in the *Citizens Committee Report,* was partially caused by the industry's increased market at lower premiums due to its remarkably high rate of return on investments. The crisis was especially hard-felt in the malpractice insurance area. In response to this crisis and to ensure the continued availability of medical liability insurance, every state enacted some type of tort reform; the statutes number over 300. Comment, *Caps, "Crisis", and Constitutionality—Evaluating the 1986 Kansas Medical Malpractice Legislation,* 35 Kan. L. Rev. 763, 765 n.18 (1987).

The Kansas Legislature and Governor took the following actions: In 1976, the Health Care Provider Insurance Availability Act, which created the Health Care Stabilization Fund, was enacted (K.S.A. 40-3401 *et seq.*); medical malpractice screening panels were established (K.S.A. 65-4901 *et seq.*); the statute of limitations was shortened as to medical malpractice actions (K.S.A. 60-513); and the collateral source rule was modified as to medical malpractice actions (K.S.A. 60-471). We upheld the modification to the statute of limitations in *Stephens v. Snyder Clinic Ass'n,* 230 Kan. 115, 631 P.2d 222 (1981). In *Wentling v. Medical Anesthesia Services,* 237 Kan. 503, 518, 701 P.2d 939 (1985), we invalidated the modification to the collateral source rule as a violation of the equal protection guarantee of our state constitution. In its 1985 session, the legislature took note of *Wentling* and repealed K.S.A. 60-471 by enacting L. 1985, ch. 197, § 5.

Some insurance industry observers correctly predicted that a new crisis would develop in the early 1980s as interest rates fell and insurance companies' investment returns decreased. See Comment, 35 Kan. L. Rev. at 770. The crisis of the 1980s is the burgeoning price of medical malpractice insurance.

Because the legislation of the 1970s had failed to halt the increasing cost of medical malpractice insurance and in response to the new crisis of the 1980s, the Kansas Legislature took the following actions in 1985: (1) a cap was placed on punitive damages in medical malpractice actions, and (2) another attempt was made at modifying the collateral source rule in medical malpractice

actions (K.S.A. 1985 Supp. 60-3403). In *Farley v. Engelken*, 241 Kan. 663, 740 P.2d 1058 (1987), we found this modification of the collateral source rule to be a violation of equal protection.

When its prior efforts failed to check the rising cost of medical malpractice insurance premiums as promised, the 1986 legislature went further, taking the following actions: medical malpractice screening panel decisions were made admissible at trial (K.S.A. 1986 Supp. 65-4904[c]); the Health Care Stabilization Fund's liability was restricted (K.S.A. 40-3403); the award of attorney fees was made contingent on approval after an evidentiary hearing (K.S.A. 1986 Supp. 7-121b[a]); the Internal Risk Management Program was created (K.S.A. 1986 Supp. 65-4922); and limitations were placed on the qualifications of expert witnesses in medical malpractice actions (K.S.A. 1986 Supp. 60-3412). Finally, the legislature attempted to limit the liability of health care providers in medical malpractice actions by capping recovery for noneconomic losses at $250,000 and by placing a total cap on all losses, both economic and noneconomic, at $1,000,000 (K.S.A. 1986 Supp. 60-3407). We invalidated this last measure as a violation of §§ 5 and 18 of the Kansas Bill of Rights in *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 757 P.2d 251 (1988) (*Malpractice Victims*).

The great majority of states have also enacted statutes to deal with the new crisis. See Comment, 35 Kan. L. Rev. at 771 n.53. And, many of these statutes provide for caps on noneconomic losses. See Brantingham, *Civil Justice Reform: The Continuing Search for Balance*, 10 Hamline L. Rev. 387, 399-402 (1987); see Annot., 80 A.L.R.3d 583; Lewis, *The Case Against Caps*, 75 Ill. B. J. 164 (1986). Many of these statutes are so recent they have not yet been challenged on appeal. As for those which have been challenged, the outcomes vary according to the arguments raised and the state constitutional provisions upon which those arguments were based.

In *Fein v. Permanente Medical Group*, 38 Cal. 3d 137, 211 Cal. Rptr. 368, 695 P.2d 665 (1985), the California Supreme Court upheld the constitutionality of a statute which limited noneconomic damage awards in medical malpractice suits to $250,000. The provisions of the California Constitution applicable in *Fein* are similar to the constitutional provisions involved in this case.

Applying a rational basis standard of review, the court rejected the plaintiff's equal protection and due process claims. The court also rejected Fein's argument that the legislature had limited the potential recovery of medical malpractice victims without providing an adequate quid pro quo, holding that (1) a plaintiff has no vested property right in a particular measure of damages, and (2) the legislature has broad authority in modifying the scope and nature of damages. 38 Cal. 3d at 157.

In reviewing similar cases from other jurisdictions, the *Fein* majority noted that the statutes challenged in those cases, with one exception, involved caps which limited both economic and noneconomic damages. 38 Cal. 3d at 161. The *Fein* dissent cited many of the same cases, emphasizing that a majority of those courts had invalidated the challenged caps regardless of the type of limitation imposed by the legislature. 38 Cal. 3d at 170.

The United States Supreme Court dismissed the subsequent appeal of *Fein* for want of a substantial federal question. 474 U.S. 892, 88 L. Ed. 2d 215, 106 S. Ct. 214 (1985). Justice White dissented as to the dismissal, noting that a majority of state courts had so far invalidated such damage caps, including those caps which were limited to noneconomic damages. 474 U.S. at 893. Justice White would have granted the appeal to consider the following question left unanswered by *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 57 L. Ed. 2d 595, 98 S. Ct. 2620 (1978): whether federal due process requires a quid pro quo when a state replaces a common-law remedy with a legislatively enacted compensation scheme.

The Supreme Court's treatment of the *Fein* appeal was acknowledged in *Ferguson v. Garmon*, 643 F. Supp. 335, 340 (D. Kan. 1986). Chief Judge O'Connor noted that the dismissal of *Fein* is most safely construed, in the absence of doctrinal developments indicating otherwise, as a ruling on the merits that a statute capping recovery of noneconomic loss presents no substantial issue under the federal constitution. See *Hicks v. Miranda*, 422 U.S. 332, 344, 45 L. Ed. 2d 223, 95 S. Ct. 2281 (1975).

In *Duren v. Suburban Community Hosp.*, 24 Ohio Misc. 2d 25, 495 N.E.2d 51 (1985), the Court of Common Pleas of Ohio, a trial court of general jurisdiction, let stand a $1,000,000 award

for pain and suffering by invalidating an Ohio statute which set a general cap of $200,000 on medical malpractice awards. Central to the court's decision was the legislature's failure to distinguish between general damages, those which "necessarily result from the injury complained of," and noneconomic damages. 24 Ohio Misc. 2d at 28. Because the parties settled, no appeal was taken from this decision. (In *Malpractice Victims*, 243 Kan. 333, we found unconstitutional a similar set of statutes that capped the total recovery of all damages, both economic and noneconomic, at $1,000,000.)

In *Smith v. Department of Ins.*, 507 So. 2d 1080, 1088-89 (Fla. 1987), the Supreme Court of Florida held a $450,000 cap on noneconomic damages violative of the right to a jury trial as guaranteed by the Florida Constitution. The court stated that a cap on such damages would be constitutional only if the legislature provided a quid pro quo or found that there was no other alternative in meeting an overpowering public necessity.

In *Lucas v. U.S.*, 757 S.W.2d 687 (Tex. 1988), the Texas Supreme Court held that a $150,000 cap on damages in medical malpractice actions violated a state constitutional provision which guarantees "remedy by due course of law." 757 S.W.2d at 690. The only damages exempted from the cap were those to compensate for past and future expenses of necessary medical, hospital, and custodial care. The court found that when the legislature set the cap, it had failed to provide an adequate substitute to obtain redress for injuries (a quid pro quo), as was done in the state's Workers Compensation Act. Following the rationale applied by the Florida court in *Smith*, the Texas court held that citizens of that state are entitled to have damages in civil actions assessed by a jury. 757 S.W.2d at 692. (Our rationale in *Malpractice Victims* is similar to the rationale of the Florida Supreme court in *Smith* and the Texas Supreme Court in *Lucas*.)

In *Boyd v. Bulala*, 647 F. Supp. 781 (W.D. Va. 1986) *reconsideration denied*, 672 F. Supp. 915 (W.D. Va. 1987), *rev'd* 877 F.2d 1191 (4th Cir. 1989), a case brought under diversity jurisdiction, the federal district court held that a Virginia statute which limits total damages in medical malpractice actions to $1 million violates the right to a jury trial as guaranteed by the 7th Amendment to the United States Constitution and by the Virginia Con-

stitution. The federal court stated that the assessment of damages was clearly a jury function under the common law and that the 7th Amendment was intended as a check on both the judiciary and the legislature. As for the Virginia Constitution, the federal district court found the state guarantee of a jury trial to be at least as strong as that provided in the federal constitution.

Without mentioning the federal district court's decision in *Boyd*, the Supreme Court of Virginia held that the statutory cap at issue in that earlier case did not violate the state constitution's guarantee of a jury trial. *Etheridge v. Medical Center Hospitals*, 237 Va. 87, 376 S.E.2d 525 (1989) (three justices dissenting). While the Virginia court agreed that a plaintiff is entitled to a jury determination of actual damages under the state constitution, it held that the legislature may limit *actual* recovery since full recovery was never guaranteed at common law. 237 Va. at 96. (Using a different rationale when reviewing workers compensation, we reached a similar result in *Rajala v. Doresky*, 233 Kan. 440, 661 P.2d 1251 [1983]).

In *Boyd v. Bulala*, 877 F.2d 1191 (4th Cir. 1989), the Court of Appeals reversed the district court's earlier judgment and upheld the constitutionality of Virginia's cap on medical malpractice damages. The court found the Virginia Supreme Court's holding in *Etheridge* dispositive of challenges made under the state constitution. 877 F.2d at 1195. As for the federal constitution, the court found no 7th Amendment violation: "If a legislature may completely abolish a cause of action without violating the right of trial by jury, we think it permissibly may limit damages recoverable for a cause of action as well." 877 F.2d at 1196. The court also found no violation of due process or equal protection since the cap was reasonably related to the legitimate goal of ensuring adequate health care services. 877 F.2d at 1196-97.

In *Franklin v. Mazda Motor Corp.*, 705 F. Supp. 1325 (D. Md. 1989), the United States District Court for the District of Maryland held a $350,000 cap on noneconomic damages in personal injury awards did not violate the federal or state constitutions. First, the Maryland court noted an individual has no vested interest in any rule of common law; therefore, the cap did not violate the right to a jury trial under the Maryland Constitution. Article 23 of the Maryland Declaration of Rights reads:

"The right of trial by Jury of all issues of fact in civil proceedings in the several Courts of Law in this State, where the amount in controversy exceeds the sum of five hundred dollars, shall be inviolably preserved." The court distinguished the role of a jury as a part "of the dispute resolution apparatus between parties" and the role of the legislature in making "rules in advance of disputes." 705 F. Supp. at 1331. The court noted that the legislature has the power to "terminate an entire valid and provable claim through a statute of limitations," and found that a remedy, as opposed to a finding of liability, is a matter of law rather than of fact. 705 F. Supp. at 1333.

The cap on noneconomic damages also withstood Franklin's second challenge based on Article 19 of the Maryland Declaration of Rights, which provides: "[E]very man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land." The court had previously determined that Article 19 gave the same due process rights as the 14th Amendment of the United States Constitution. Access to the courts of Maryland is determined under a test of reasonableness, with no requirement of heightened scrutiny. The court held the cap bore a reasonable relation to a valid legislative purpose, but acknowledged that some states, such as Kansas, find "more protection in their state due process clauses." 705 F. Supp. at 1337 (citing *Malpractice Victims*, 243 Kan. 333). The court also acknowledged that "some state constitutions treat full recovery in tort as a fundamental right." 705 F. Supp. at 1337 (citing *Barrio v. San Manuel*, 143 Ariz. 101, 692 P.2d 280 [1984]).

In *Sofie v. Fibreboard Corp.*, 112 Wash. 2d 636, 771 P.2d 711 (1989), the Washington Supreme Court held a statutory limitation on noneconomic damages unconstitutional. The damage limitation operated on a formula based upon the age of the injured plaintiff. The court, without addressing the equal protection claim, found that the statute's limitation on noneconomic damages in medical malpractice actions interferes with the jury's traditional function of determining damages.

In *Meech v. Hillhaven West, Inc.*, 776 P.2d 488 (Mont. 1989), a group of employees brought action in the United States District

Court for the District of Montana claiming damages for their wrongful termination from employment, breach of implied covenant of good faith and fair dealing, and intentional or negligent infliction of emotional distress. The United States District Court certified the following question: Did the Montana Wrongful Discharge From Employment Act (1) unconstitutionally deprive workers under the Act of their right to "full legal redress," and (2) wrongfully prohibit the recovery of noneconomic damages and limit the recovery of punitive damages?

The Montana Supreme Court recognized that no one has a vested right to any rule of common law. The legislature, under its plenary power to act for the general welfare, may alter common-law causes of action if it provides an adequate quid pro quo. 776 P.2d at 494. In this case, since the legislature had provided adequate substitutes for causes of actions abrogated by the Act, the Montana Supreme Court found the Act to be constitutional. 776 P.2d at 506.

In *Davis v. Omitowoju*, 883 F.2d 1155 (3d Cir. 1989), plaintiff sued her physician for having negligently performed a knee surgery to which she had not consented. The jury awarded plaintiff $640,000, which the trial court reduced to $403,294.92 pursuant to a Virgin Islands statute which caps noneconomic damages in such cases at $250,000. On appeal, the third circuit cited *Boyd v. Bulala*, 877 F.2d 1191, and summarily dismissed plaintiff's arguments that the cap violated federal guarantees of equal protection and due process. The court further held that the statute did not violate plaintiff's right to a jury trial: "Where it is the legislature which has made a rational policy decision in the public interest, as contrasted with a judicial decision which affects only the parties before it, it cannot be said that such a legislative enactment offends either the terms, the policy or the purpose of the Seventh Amendment." 883 F.2d at 1165.

In the case before this court, the question certified by the United States District Court for the District of Kansas arises out of a personal injury action wherein the plaintiff, Douglas Samsel, claims that one of the defendants, Don Hilgenfeld, negligently caused an automobile accident by driving left of the center line. Samsel was rendered a quadriplegic as a result of this accident. Other defendants are Wheeler Transport Services, Inc., Hilgen-

feld's employer, and Great West Casualty Co., Wheeler's insurance company. Douglas Samsel is a resident of Kansas; Hilgenfeld of Nebraska. Wheeler has its principal place of business in Nebraska and Great West is organized under Nebraska law. The case was filed in federal court based on diversity of citizenship pursuant to 28 U.S.C. § 1332 (1982).

When the accident occurred on May 16, 1988, K.S.A. 1987 Supp. 60-19a01 was in effect. This statute caps damages in personal injury actions for pain and suffering at $250,000. When Chief Judge O'Connor certified the present question on October 27, 1988, K.S.A. 1988 Supp. 60-19a01 and -19a02 were in effect. The 1987 and 1988 versions of 60-19a01 are identical, except that the 1988 amendment adds language which limits its application to causes of action which accrue before July 1, 1988. K.S.A. 1988 Supp. 60-19a02, which applies to causes of action accruing on or after July 1, 1988, differs from 60-19a01 in that medical malpractice liability actions are no longer exempted and the term "pain and suffering" was replaced by "noneconomic loss."

K.S.A. 1988 Supp. 60-19a02 is set out below. Diagonals indicate language from 60-19a01 which was not included in -19a02; italics indicate new language that did not appear in -19a01.

"(a) As used in this section, 'personal injury action' means any action for damages for personal injury or death ~~except for medical malpractice liability actions~~.

"(b) In any personal injury action, the total amount recoverable by each party from all defendants for all claims for ~~pain and suffering~~ *noneconomic loss* shall not exceed a sum total of $250,000.

"(c) In every personal injury action, the verdict shall be itemized by the trier of fact to reflect the amount awarded for ~~pain and suffering~~ *noneconomic loss*.

"(d) If a personal injury action is tried to a jury, the court shall not instruct the jury on the limitations of this section. If the verdict results in an award for ~~pain and suffering~~ *noneconomic loss* which exceeds the limit of this section, the court shall enter judgment for $250,000 for all the party's claims for ~~pain and suffering~~ *noneconomic loss*. *Such entry of judgment by the court shall occur after consideration of comparative negligence principles in K.S.A. 60-258a and amendments thereto.*

"(e) The provisions of this section shall not be construed to repeal or modify the limitation provided by K.S.A. 60-1903 and amendments thereto in wrongful death actions.

"(f) The provisions of this section shall apply only to personal injury actions which are based on causes of action accruing ~~on or after July 1, 1987,~~ *on or after July 1, 1988.*"

Our resolution of the issue presented by the certified question—whether K.S.A. 1987 Supp. 60-19a01 violates the Kansas Constitution—applies equally to K.S.A. 1988 Supp. 60-19a02 since that statute gives rise to no additional issues. Although a plaintiff in Samsel's position after July 1, 1988, would be bound by K.S.A. 1988 Supp. 60-19a02, no purpose would be served by requiring him or her to argue the same issues resolved in this case. See *Manzanares v. Bell,* 214 Kan. 589, 593-95, 522 P.2d 1291 (1974); *Dairy Belle v. Freeland,* 175 Kan. 344, 345, 264 P.2d 894 (1953).

The certified question limits our review to an analysis of the Kansas Constitution. The federal court will decide whether the contested statute offends the federal constitution. See 17A Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4248, p. 174 (1988). Specifically, plaintiff argues that the statutory cap violates §§ 5 and 18 of the Bill of Rights in the Kansas Constitution. Section 5 states: "The right of trial by jury shall be inviolate." Section 18 is almost as succinct: "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."

We have previously said that § 18 protects the right to "reparation for injury, ordered by a tribunal having jurisdiction, in due course of procedure and after a fair hearing." *Ernest v. Faler,* 237 Kan. 125, 131, 697 P.2d 870 (1985) (quoting *Hanson v. Krehbiel,* 68 Kan. 670, Syl. ¶ 2, 75 Pac. 1041 [1904]). Though the *amicus curiae* argues that § 18 protects the remedy itself and that the procedural mechanisms of due process are protected by § 1 of the Kansas Bill of Rights, that argument does not change our decision.

The certified question requires us to review our state constitution, the role of the common law, legislative and judicial power vis-a-vis the common law, and the separation of powers doctrine. It is also essential that we analyze the doctrine of stare decisis and the consequences of our prior decisions.

Our constitution is a written charter enacted by the direct action of the citizens of Kansas. It is a compilation of the fundamental laws of the state and embodies the principles upon

which the state government was founded. The object of our constitution is to provide a government of law and not of men, while insuring the protection of life, liberty, and property.

The state constitution establishes the form of our government. Like the Constitution of the United States, the Constitution of Kansas contains no express provision requiring the separation of governmental powers, but all decisions of this court have taken for granted the constitutional doctrine of separation of powers between the three branches of the state government—legislative, executive, and judicial. Absolute and complete separation of powers of government is impracticable and was not intended. *State v. Railway Co.*, 76 Kan. 467, 474, 92 Pac. 606 (1907). All governmental sovereign power is vested in the legislature, except such as is granted to the other branches of government or expressly withheld from the legislature by constitutional restrictions. *Leek v. Theis*, 217 Kan. 784, Syl. ¶ 7, 539 P.2d 304 (1975). It is the primary duty of the courts to safeguard the declaration of rights and remedies guaranteed by constitutional provisions. *Brown v. Wichita State University*, 217 Kan. 279, Syl. ¶ 18, 540 P.2d 66 (1975).

Our constitution does not make this court the critic of the legislature; rather, this court is the guardian of the constitution and every legislative act comes before us with a presumption of constitutionality. A statute will not be declared unconstitutional unless its infringement on the superior law of the constitution is clear, beyond substantial doubt. *State ex rel. Crawford v. Robinson*, 1 Kan. 17, 27 (1862). The interpretation of constitutional principles is an important responsibility for both state and federal courts. In determining whether a statute is constitutional, courts must guard against substituting their views on economic or social policy for those of the legislature. Courts are only concerned with the legislative power to enact statutes, not with the wisdom behind those enactments. When a legislative act is appropriately challenged as not conforming to a constitutional mandate, the function of the court is to lay the constitutional provision invoked beside the challenged statute and decide whether the latter squares with the former—that is to say, the function of the court is merely to ascertain and declare whether legislation was enacted

in accordance with or in contravention of the constitution—and not to approve or condemn the underlying policy.

The common law can be determined only from decisions in former cases bearing upon the subject under inquiry. As distinguished from statutory or written law, the common law embraces that great body of unwritten law founded upon general custom, usage, or common consent, and based upon natural justice or reason. It may otherwise be defined as custom long acquiesced in or sanctioned by immemorial usage and judicial decision. 15A Am. Jur. 2d, Common Law § 1.

In a broader sense, the common law is the system of rules and declarations of principles from which our judicial ideas and legal definitions are continually derived. See generally *Steele v. Latimer*, 214 Kan. 329, 332, 521 P.2d 304 (1974). It is not a codification of exact or inflexible rules for human conduct, the redress of injuries, or protection against wrongs; rather, it is the embodiment of broad and comprehensive unwritten principles, inspired by natural reason and an innate sense of justice, and adopted by common consent for the regulation and government of the affairs of men. 15A Am. Jur. 2d, Common Law § 1.

The common law became effective in Kansas when the organic act passed. "By law of 1855 (*Statutes*, p. 469,) the common law of England and all statutes prior to 4 James I. not local to that kingdom, and of a general nature, except statutes for the punishment of crimes and misdemeanors, were adopted 'as the rule of action and decision in the territory.' This adopted the common law as to rights of action and forms of remedy so far as it was consistent with the constitution and laws of the United States and the statutes of Kansas." *Sattig v. Small*, 1 Kan. 170, 175 (1862). The original act stated that the legislature had the power to enact statutes contrary to any rule of action and decision in the territory, or any law, custom, or usage. In 1868 the original act was repealed and an expanded use of the common law was adopted by the legislature. G.S. 1868, Ch. 119, Art. I, § 3 stated:

"The common law, as modified by constitutional and statutory law, judicial decisions, and the condition and wants of the people, shall remain in force in aid of the general statutes of this state; but the rule of the common law, that statutes in derogation thereof shall be strictly construed, shall not be

applicable to any general statute of this state; but all such statutes shall be liberally construed to promote their object."

This wording remains in effect today. K.S.A. 77-109.

The first question which must be addressed is whether the right to a jury trial in civil cases under the common law included the right to have the jury determine damages. Since there is no authority which precisely lays out the rules of common law, courts often look to English practice in order to discover the "common law" in existence during a relevant period. See Moore, *The Jury* 144 (1988). Historical research does not provide a clear-cut answer to the first question.

The United States Supreme Court recently stated that its research showed there to be no substantive right under the common law to a jury determination of damages. In *Tull v. United States,* 481 U.S. 412, 95 L. Ed. 2d 365, 107 S. Ct. 1831 (1987), the Court addressed the scope of the right to trial by jury under the 7th Amendment to the United States Constitution. While the Court held that *liability* under the Clean Water Act could only be determined by a jury, it went on to hold that there is no constitutionally protected right to a jury determination of *damages* in the event that liability is imposed. The Court stated:

"The 7th Amendment is silent on the question whether a jury must determine the remedy in a trial in which it must determine liability. *The answer must depend on whether the jury must shoulder this responsibility as necessary to preserve the 'substance of the common-law right of trial by jury.'* [Citation omitted.] Is a jury role necessary for that purpose? We do not think so. 'Only those incidents which are regarded as fundamental, as inherent in and of the essence of the system of trial by jury, are placed beyond the reach of the legislature.' [Citations omitted.] The assessment of a civil penalty is not one of the 'most fundamental elements.'" 481 U.S. at 425.

The footnote appended to the quoted text explained:

"Nothing in the Amendment's language suggests that the right to a jury trial extends to the remedy phase of a civil trial. Instead, the language 'defines the kind of cases for which jury trial is preserved, namely "suits at common law." ' [Citation omitted.] Although ' "[w]e have almost no direct evidence concerning the intention of the framers of the seventh amendment itself," the historical setting in which the Seventh Amendment was adopted highlighted a controversy that was generated . . . by fear that the civil jury itself would be abolished.' [Citation omitted.] We have been presented

with no evidence that the Framers meant to extend the right to a jury to the remedy phase of a civil trial." 481 U.S. at 426 n.9.

On the other hand, Blackstone reported the following in a discussion concerning interlocutory judgments:

"But the interlocutory judgments, most usually spoken of, are those incomplete judgments, whereby the *right* of the plaintiff is indeed established, but the *quantum* of damages sustained by him is not ascertained; which is a matter that cannot be done without the intervention of a jury. As by the old Gothic constitution the cause was not completely finished, till the *nembda* or jurors were called in '*ad executionem decretorum judicii, ad aestimationem pretii, damni, lucri, &c.*' [before the decree of judgment was rendered, to make a valuation of costs, damages, gain, etc.] . . . . [W]here damages are to be recovered, a jury must be called in to assess them; unless the defendant, to save charges, will confess the whole damages laid in the declaration." 3 Blackstone, Commentaries *397-98.

The United States Supreme Court has determined that the guarantee of a jury trial under the 7th Amendment is limited and does not extend to the remedy phase of a civil trial. We have interpreted our constitution as granting broader rights to the citizens of this state. The state constitution and the Kansas common law recognize that the right to a jury trial includes the right to have the jury determine damages. See *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 342-43, 757 P.2d 251 (1988) (*Malpractice Victims*). This is not an unlimited right and the limitations on the right to a jury determination of damages will be discussed later.

The next question is whether damages for pain and suffering, or other noneconomic damages, are awarded under the common law. The first recorded case in which a court explicitly recognized pain and suffering was the "squib" case in which the plaintiff lost both eyes and "underwent and suffered great excruciating pain and torment for a long time [to wit] for the space of six months." *Scott v. Sheperd*, 95 Eng. Rep. 1124 (K.B. 1773) (cited in O'Connell & Carpenter, *Payment for Pain and Suffering Through History*, 50 Ins. Counsel J. 411, 412 [1983]). In the 1822 case of *Pippin v. Sheppard*, 25 Rev. Rep. 746 (Ex. 1822) (cited in 50 Ins. Counsel J. at 412) the court explicitly stated that the judgment included damages for pain and suffering. Formbooks of the time, including Wentworth's A Complete System of Pleading (1798), provided for the routine pleading of pain and suffering

damages in personal injury actions. If American courts had not allowed damages for pain and suffering before, it is clear that they began to do so after *Pippin.* See 50 Ins. Counsel J. at 412-13 for discussion of *Verril v. Minot,* 31 Me. 299 (1850); *Morse v. Auburn & Syracuse R.R.,* 10 Barb. 621 (N.Y. Sup. Ct. 1851); *Ransom v. New York and E.R.R.,* 15 N.Y. 415 (1857). By 1861, when the Kansas Constitution was adopted, "legal precedent clearly supported compensation for pain and suffering." 50 Ins. Counsel J. at 413.

Section 18 of the Kansas Bill of Rights mandates the awarding of damages to the injured party based on the theory of compensation for loss suffered. See *McGrew v. Investment Co.,* 106 Kan. 348, 351, 187 Pac. 887 (1920). Under the common law, the purpose of awarding damages is to make a party whole by restoring that party to the position he was in prior to the injury. *State ex rel. Stephan v. Wolfenbarger & McCulley, P.A.,* 236 Kan. 183, 189, 690 P.2d 380 (1984). Damages to restore a person to his prior position are divided into economic and noneconomic damages. Economic damages include the cost of medical care, past and future, and related benefits, *i.e.,* lost wages, loss of earning capacity, and other such losses. Noneconomic losses include claims for pain and suffering, mental anguish, injury and disfigurement not affecting earning capacity, and losses which cannot be easily expressed in dollars and cents. *Malpractice Victims,* 243 Kan. at 337.

Are noneconomic damages recoverable in personal injury actions under the Kansas common law? In 1870, we stated that, in the absence of malice or fraud, the jury should consider the following when determining compensation in a personal injury action: the pecuniary loss; suffering; loss of time; actual expenses incurred; the character of the injury, as to whether it is permanent or temporary in its consequences; and the condition or circumstance of the injured party. *Tefft v. Wilcox,* 6 Kan. 46, 57 (1870). We therefore conclude that in personal injury actions, noneconomic damages, such as pain and suffering, are elements of Kansas common-law damages for the jury to consider.

Because of the nature of noneconomic damages, there is no clear method for measuring the loss and determining the amount of compensation due. The standard of evaluation by which an

award for noneconomic damages is measured is such amount as a reasonable person estimates to be fair compensation when that amount appears to be in harmony with the evidence as arrived at without passion or prejudice. *Fudge v. City of Kansas City,* 239 Kan. 369, Syl. ¶ 6, 720 P.2d 1093 (1986).

The difficulty in determining the amount a reasonable person would award an injured party for his or her noneconomic loss has been recognized by both this court and the legislature. When instructing juries on how to assess damages for pain and suffering, our trial courts acknowledge: "For such items as pain, suffering, disability and mental anguish there is no unit value and no mathematical formula the Court can give you. You should award such sum as will fairly and adequately compensate him. The amount to be awarded rests within your sound discretion." PIK Civ. 2d 9.01. The lack of any precise guide for measuring noneconomic loss is also a problem for reviewing courts which must decide whether such jury awards are either excessive or inadequate.

The legislature's enactment of K.S.A. 1987 Supp. 60-19a01 was influenced by the *Citizens Committee Report.* The Citizens Committee found that the unpredictability of awards for pain and suffering "makes it very difficult to write insurance or to self-insure at appropriate premium or cost levels, and also sometimes results in pain and suffering awards that are so high they result in unreasonable premium increases. In many instances, these increases reach the level of unaffordability." *Citizens Committee Report* 64. The committee recommended a cap on noneconomic damages to limit uncertainty in this area. *Citizens Committee Report* 63-64 (Recommendation 11).

Although we have determined that an injured party has a constitutional right to be made whole and a right to damages for economic and noneconomic losses suffered, it is clear that recovery for noneconomic loss suffered is not really compensation to make an injured party whole. Such damages are actually compensation to the injured party for loss of the quality of life, *i.e.,* disability, pain, and suffering.

Defendants complain that by our prior decisions we have created a specially protected category of people, *i.e.* personal injury plaintiffs and, by doing so, we have violated § 2 of the Kansas Bill of Rights, which provides:

"All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit. No special privileges or immunities shall ever be granted by the legislature, which may not be altered, revoked or repealed by the same body; and this power shall be exercised by no other tribunal or agency."

In *Stephens v. Snyder Clinic Ass'n*, 230 Kan. 115, 128, 631 P.2d 222 (1981), we refused to apply § 2 when the plaintiff challenged, on constitutional grounds, the statute of limitations which had been shortened for negligence actions against health care providers. We held the issue involved the equal rights guarantee of § 1 of the Kansas Bill of Rights rather than § 2 because the political powers and privileges reserved by the people in § 2 do not apply to the personal or property rights of an individual. We cited cases wherein we had construed § 2 as applying solely to political privileges. See, *e.g.*, *State ex rel. v. Urban Renewal Agency of Kansas City*, 179 Kan. 435, 439, 296 P.2d 656 (1956).

Defendants also cite *Henry v. Bauder*, 213 Kan. 751, 518 P.2d 362 (1974), and argue that we used § 2 in that case to find the automobile guest statute unconstitutional. While we cited § 2 in *Henry*, our decision was based upon the equal protection guarantee of § 1. It is true that we have often cited § 2 along with § 1 in cases involving equal protection challenges, but we have never held that § 2 protects property rights in the way that defendants would now like to argue.

Defendants also complain that we have been "inconsistent" in our analyses of various tort reform measures—that it is unforeseeable whether we will use §§ 1, 2, 5, 18, or "some other" rationale to "strike down" any legislation which is beneficial to defendants. Such a simplistic statement fails to recognize the jurisdictional limitations of appellate courts and the restraint traditionally exercised by such courts in limiting the scope of their decisions to the issues raised by the parties on appeal. Our decisions would undoubtedly be more "consistent" if we, rather than the parties, framed the issues we are asked to decide.

Defendants assert that this court has granted greater constitutional protection to persons who are injured than to those whose negligence caused the injury. They cite *Farley v. Engelken*, 241 Kan. 663, 740 P.2d 1058 (1987) as support, claiming that a heightened level of scrutiny was improperly created and then applied

in an equal protection challenge to a statute which abolished the collateral source rule in medical malpractice cases. This analysis is incorrect for two reasons. First, only Justice Herd, the author of the opinion, and then Chief Justice Prager applied the heightened scrutiny analysis. Two justices, Justices Lockett and Allegrucci, concurred in the result but disagreed with the application of the heightened scrutiny test and applied the rational basis test. Both agreed that equal protection requires that all who are injured by another's negligent act have an equal right to compensation from the negligent tortfeasor, regardless of any classification that the legislature has attempted to impose. If the legislature wishes to change the rules of evidence by abrogating the collateral source rule, it may do so if applied equally to all who are injured by the negligent act of another. The three dissenting justices also applied the rational basis test. Secondly, the case is not applicable as the plaintiff here does not challenge the statute on equal protection grounds. (Elsewhere in their briefs, defendants erroneously claim we applied a strict scrutiny test in *Malpractice Victims*, even though there was no equal protection claim decided.)

Individuals who perceive an inconsistency between our denial of the legislature's attempt to place caps on damages in *Malpractice Victims* and our acquiescence to legislative caps in other instances, such as wrongful death and the Kansas Automobile Injury Reparations Act should reread Chief Justice Prager's analysis in *Malpractice Victims*. First, the remedy for wrongful death is a creation of statute and not a remedy existing under the common law. Thus, both the remedy and the limitations on damages were created by the legislature.

Second, there is no inconsistency in our prior decisions. In *Rajala v. Doresky*, 233 Kan. 440, 661 P.2d 1251 (1983), this court upheld the Workers Compensation Act. In *Manzanares v. Bell*, 214 Kan. 589, 602-608, 522 P.2d 1291 (1974), we upheld the Kansas Automobile Injury Reparations Act, K.S.A. 40-3101 *et seq.*, since the legislative acts bore a rational relationship to the legislative objective and were not arbitrary or unreasonable because the legislature had provided a sufficient quid pro quo for the limitations imposed. In *Malpractice Victims*, 243 Kan. 333, we invalidated the legislative caps placed on the recovery of losses

in medical malpractice actions because the legislature had failed to provide a sufficient quid pro quo for the loss of the injured party's right for the jury to determine the amount of damages. These cases reflect a majority of this court's adherence to the doctrine of stare decisis.

When answering the federal district court's question, we arrive at the decision based upon a background of precedent, tradition, and institutional constraints that limit or channel changes. It is recognized under the doctrine of stare decisis that, once a point of law has been established by a court, that point of law will generally be followed by the same court and all courts of lower rank in subsequent cases where the same legal issue is raised. Stare decisis operates to promote system-wide stability and continuity by ensuring the survival of decisions that have been previously approved by a court. While an unconstitutional exercise of power by either the executive or legislative branches may be checked by the judicial branch, the only check upon our own exercise of power is our own sense of self-restraint. See *United States v. Butler*, 297 U.S. 1, 78, 80 L. Ed. 477, 56 S. Ct. 312 (1935) (Stone, J., dissenting). The application of stare decisis ensures stability and continuity—demonstrating a continuing legitimacy of judicial review. Judicial adherence to constitutional precedent ensures that all branches of government, including the judicial branch, are bound by law.

This court is reluctant to treat as still open a question which it has once definitely passed upon. The general American doctrine as applied to courts of last resort is that a court is not inexorably bound by its own precedents but will follow the rule of law which it has established in earlier cases, unless clearly convinced that the rule was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent. See *Helvering v. Hallock*, 309 U.S. 106, 84 L. Ed. 1104, 60 S. Ct. 746 (1939). The distinction between decisions construing statutes and those construing the constitution is that if the people are dissatisfied with the construction of a statute, the frequently recurring sessions of the legislature afford easy opportunity to repeal, alter, or modify the statute. The constitution, on the other hand, is organic and intended to be enduring until changing conditions of society demand more strin-

gent or less restrictive regulations. If a decision construes the constitution in a manner not acceptable to the people, the opportunity of changing the organic law is remote.

We previously found the Workers Compensation Act constitutional, even though the worker is not entitled to a trial by jury on any issue and the Act provides no compensation for pain and suffering. In fact, in some cases, the Act provides less compensation for economic loss than has actually been suffered by the injured worker. In addition, workers compensation claimants may not maintain a civil damage action against a fellow employee for any injury for which compensation is recoverable. But in return for the loss of these substantive rights, injured workers are relieved of the burden of proving fault on the part of the employer prior to establishing their right for compensation and receive more certain and speedy payment. We held those compensations are a sufficient quid pro quo to validate the Act. We stated that once the Kansas Legislature has determined the better public policy, it is not the prerogative of this court to modify such legislative determination. *Rajala v. Doresky*, 233 Kan. at 442.

When determining a similar issue to the question submitted by the federal district court in *Manzanares v. Bell*, 214 Kan. 589, we found that although the Kansas Automobile Injury Reparations Act, K.S.A. 40-3101 *et seq.*, does not affect an injured party's right to a jury trial or limit the recovery of economic losses, it does prohibit recovery for pain and suffering or other nonpecuniary loss except in the event of certain types of personal injury, or where the injury requires medical treatment of a value of at least $2,000. K.S.A. 40-3117. We held, nevertheless, that the mandatory availability of no-fault insurance, even though purchased by the injured party, is a sufficient quid pro quo for the limitation on the recovery for noneconomic damages. 214 Kan. at 599. Therefore, the Act did not violate § 18 of the Kansas Bill of Rights. We again recognized it was not within the province of this court to weigh the desirability of social or economic policy underlying a statute, or to weigh the beneficial results flowing from any particular legislative policy. 214 Kan. at 603.

In *Malpractice Victims*, 243 Kan. 333, we declared a comprehensive set of statutes which: (1) limited the amount of recovery for noneconomic loss to $250,000; (2) capped the total recovery

of all damages, both economic and noneconomic, at $1,000,000; and (3) required an annuity for payment of future economic loss in all medical malpractice actions violative of §§ 5 and 18 of the Bill of Rights of the Kansas Constitution.

Our constitution provides that the common-law right to a jury trial includes the right to have the jury determine the amount of the damages in personal injury actions. An individual does not, however, have a vested right in the common-law rules governing negligence actions. The legislature can modify the right to a jury trial and the right of a jury determination of the amount of damages through its power to change the common law, but the legislature's right is not absolute. Statutory modification of the common law must meet due process requirements and be reasonably necessary in the public interest to promote the general welfare of the people of the state. Due process requires that the legislature substitute the viable statutory remedy of quid pro quo (this for that) to replace the loss of the right. See generally Note, *Restrictive Medical Malpractice Compensation Schemes: A Constitutional "Quid Pro Quo" Analysis to Safeguard Individual Liberties*, 18 Harv. J. on Legis. 143 (1981).

The majority of this court in *Malpractice Victims*, 243 Kan. 333, asserted that the legislature's modification of the common law, by placing caps on the amount of damages an injured plaintiff could recover in medical malpractice actions, without substituting a sufficient quid pro quo, violated the right to have a jury determine damages under §§ 5 and 18. In addition, a statutory scheme of compulsory liability insurance (though purchased by the defendant) was not a quid pro quo for caps on damages suffered by the injured plaintiff, since the liability insurance had been mandated by the legislature prior to the passage of the caps legislation. Justice Holmes and Justice McFarland each dissented.

In *Malpractice Victims*, we determined that damages are a jury issue under § 5 of the Kansas Bill of Rights and our prior holdings. We held that by enacting the statutes which limited a plaintiff's common-law remedy without providing an adequate substitute remedy, the legislature violated § 18 of the Kansas Bill of Rights. Though mentioned in the opinion, we did not explore the potential for frustration of the right of the jury to determine damages by the court's common-law power to exercise

its discretion to reduce a jury's award by remittitur. The question of whether the statute's mandatory language which prohibits the court from modifying a jury's award of noneconomic losses of $250,000 or less provides a sufficient quid pro quo was left unanswered.

Section 5 of the Kansas Bill of Rights protects the right to jury trial as it existed under common law at the time the constitution was adopted. *Malpractice Victims*, 243 Kan. at 342. Under the common law, jury verdicts have always been subject to the concurrence of the trial judge and the trial judge's power to grant a new trial. The right of the trial court and the appellate court to grant a remittitur or a new trial does not violate the individual's right to a jury trial guaranteed by the United States Constitution. See *Capital Traction Co. v. Hof*, 174 U.S. 1, 43 L. Ed. 873, 19 S. Ct. 580 (1899).

A court may refuse to accept a jury's finding of damages in a personal injury case if, in the light of the evidence, the amount is either so high or so low as to shock the conscience of the court. *Ingram v. Howard-Needles-Tammen & Bergendoff*, 234 Kan. 289, 299-300, 672 P.2d 1083 (1983); *Smith v. Newell*, 210 Kan. 114, 117, 499 P.2d 1112 (1972). The court, in such a case, may offer the affected party the opportunity to accept a damage verdict more in line with the evidence. If the party consents to the altered verdict, the party loses the right to appeal as to the amount of damages. If the party refuses to accept the altered verdict, the court may order a new trial, in which the party again faces the court's discretion to refuse to order damages in the amount found by the jury. See *Thurman v. Cundiff*, 2 Kan. App. 2d 406, 580 P.2d 893 (1978), for a discussion of the court's power.

The court's right to refuse to accept a jury's finding of damages in a personal injury case is not unlimited. By enacting 1901 General Statutes § 4755 the legislature exercised its power to divest the court's common-law authority to grant a new trial when the court deemed a jury's verdict inadequate. The repeal of that provision in the 1904 version of the code was interpreted by this court as recognition by the legislature that the question of inadequacy of a jury's verdict is a proper ground for the courts to grant a new trial. *Sundgren v. Stevens*, 86 Kan. 154, 119 Pac. 322 (1911). We have held that a jury verdict on damages, which

is deemed to be grossly inadequate by the trial court, may constitute a basis for the granting of a new trial *in the absence of a statute to the contrary. Levy v. Jabara,* 193 Kan. 595, Syl. ¶ 1, 396 P.2d 339 (1964); *Henderson v. Kansas Power & Light Co.,* 188 Kan. 283, 362 P.2d 60 (1961). In both cases we acknowledged the right of the legislature to exercise its power. We recognized that these legislative rules may be hard, and in some cases may produce injustice, but that is a consideration to be addressed to the lawmakers and not to the law interpreters. See *Railway Co. v. O'Neill,* 68 Kan. 252, 256-57, 74 Pac. 1105 (1904).

From 1923 until 1964, issues of remittitur were decided under G.S. 1949, 60-3004, which read, "In cases tried by a jury the court, with the consent of the prevailing party, may reduce the verdict by such part as is not warranted by the evidence and render judgment for the residue, or grant a new trial when justice requires it." The statute precluded remittitur without the plaintiff's consent. Lacking consent, the court's authority was limited to the granting of a new trial. See *McAlister v. McNown,* 174 Kan. 608, 611-12, 258 P.2d 309 (1953).

When the new code of civil procedure became effective on January 1, 1964, there was no statute corresponding to G.S. 1949, 60-3004 expressly granting the authority of remittitur to the Kansas courts, and contrary to our pronouncement in *McAlister,* we exercised our power to directly reduce a jury award of damages without giving the affected party the opportunity to elect a new trial. See *Rooks v. Brunch,* 202 Kan. 441, 449 P.2d 580 (1969). In 1976, however, we held that substitution of the judgment of the court for that of the jury on damages without the consent of the affected party violates the 7th Amendment to the United States Constitution. See *Ford v. Guarantee Abstract & Title Co.,* 220 Kan. 244, 276, 553 P.2d 254 (1976) (disapproving *Rooks v. Brunch,* 202 Kan. 441).

Both jury awards for noneconomic loss and the question of whether a court will exercise its power to grant a remittitur are unpredictable. Because of their nature, it is difficult to foresee the amount of noneconomic or punitive damages which will be awarded by a jury or remitted by a court.

In *Smith v. Newell,* 210 Kan. at 117-18, we commented on the disparity in views on proper damages between liberal and

conservative judges as one reason that the jury, with its greater likelihood of reaching a community consensus, should be upheld in its determination of damages in all but the most exceptional cases. Setting a cap on the maximum award of noneconomic damages would do away with variations in the award of damages above a certain level and meet the desired objective of limiting variations from court to court. The mandatory language of 60-19a01 and -19a02, while protecting defendants from liberal juries and judges, also protects plaintiffs from conservative trial judges.

Equal protection requires that those who are injured by another's negligent act have an equal right to compensation regardless of any classification the legislature attempts to impose. *Farley v. Engelken,* 241 Kan. at 680 (Lockett, J., concurring). The right is not unlimited. The legislature may deprive a class of individuals of their right to a jury trial, the right to recover noneconomic loss, and the right to recover full compensation for injuries suffered if the injured class is relieved of the burden of proving fault on the part of the wrongdoer and receives a more certain and speedy recovery. See *Rajala v. Doresky,* 233 Kan. 440. Without altering the individual's right to a jury trial, the legislature may limit recovery of noneconomic losses by providing a sufficient quid pro quo for the limitation. *Manzanares v. Bell,* 214 Kan. at 599. The legislature cannot restrict the jury's right to determine the loss or place a statutory limitation on the recovery of economic and noneconomic loss only on the victims of malpractice. *Malpractice Victims,* 243 Kan. 333.

If the Kansas Constitution prohibits the legislature from modifying an injured party's right to a jury trial and from limiting recovery for economic or noneconomic losses when deciding *Malpractice Victims,* this court would have been required to declare the Workers Compensation Act and the Kansas Automobile Injury Reparations Act unconstitutional. We did not. Because we did not, we must now adhere to the doctrine of stare decisis. In the past, we have recognized that the legislature, under its power to act for the general welfare, may alter common-law causes of action and constitutional rights if it provides an adequate quid pro quo. If that determination of the legislature's power is wrong, substantial justice is better promoted by adhering to that erro-

neous decision than by overthrowing the rule established. See *Weaver v. Bank*, 76 Kan. 540, 540-45, 94 Pac. 273 (1907).

Neither K.S.A 1988 Supp. 60-19a01 nor -19a02 alter the right of the plaintiff to a civil jury trial or deprive the injured party of the right to a jury to determine and award all economic damages required to return the injured party to the party's prior economic status. K.S.A 1988 Supp. 60-19a01 and -19a02, while taking away a plaintiff's right to receive noneconomic losses in excess of $250,000, also insure the injured plaintiff that the court will not exercise its discretion to award *less* than $250,000 when higher damages are awarded by the jury. The statutes do provide a quid pro quo to the individual whose jury awards damages for pain and suffering or noneconomic loss that exceed the cap.

The statute is a cap only on noneconomic damages and does not limit the court's power to reduce any other portion of the award it deems excessive. The duty of a court to protect parties from unjust verdicts arising from ignorance of the rules of law and of evidence, from impulse of passion or prejudice, or from any other violation of their lawful rights in the conduct of the trial is still maintained. *Pleasants v. Fant*, 89 U.S. 116, 121, 22 L. Ed. 780 (1875).

Denying those with the greatest pain and suffering a full remedy in order to ease insurance rates for those who cause injury was considered and approved by a majority of the legislature. The legislature is aware that the cap on noneconomic loss will affect the right to recover by those most severely injured in Kansas. See testimony of Legislative Chairman of the Kansas Bar Association to the House Judiciary Committee, Mar. 3, 1987. Laws that restrict those who suffer the greatest pain, mental anguish, and disfigurement from a case-by-case determination of individual damages by jury are harsh. However, our determination is that, under proper circumstances, the legislature may limit recovery of noneconomic losses of those individuals whose quality of life has been most affected.

To be consistent with our prior decisions in *Rajala v. Doresky*, 233 Kan. 440 (upholding the Workers Compensation Act); *Manzanares v. Bell*, 214 Kan. 589 (upholding the Kansas Automobile Injury Reparation Act, K.S.A. 1988 Supp. 40-3117); and *Malpractice Victims*, 243 Kan. 333 (invalidating the legislative caps

placed on the recovery of losses in medical malpractice actions), the answer to the certified question is that K.S.A. 1987 Supp. and 1988 Supp. 60-19a01 and K.S.A. 1988 Supp. 60-19a02 do not violate § 5 (right to a jury) or § 18 (right to due course of law for injuries suffered) of the Kansas Bill of Rights.

MCFARLAND, J., concurring: I concur with the result reached by the majority but disagree on the rationale employed in the majority opinion.

Section 5 of the Kansas Bill of Rights provides:

"The right of trial by jury shall be inviolate."

Section 18 of the Kansas Bill of Rights provides:

"All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."

The majority opinion has the effect of lumping together the right to trial by jury on the question of liability and the remedy to be afforded if liability is established, and then freezing the lump in a common-law time warp. I find no legal basis for including the scope of the remedy in the right to a jury trial. I believe the scope of the remedy to be afforded is a matter of legislative determination without the quid pro quo requirement affixed by the majority. As noted in the majority opinion, a number of other states have upheld damage caps without a quid pro quo requirement.

Section 5 applies to all cases in which jury trials are mandatory—both civil and criminal. It applies equally to plaintiffs and defendants. No one seriously claims the legislature cannot alter permissible sentence lengths and fines because to do so would violate article 3 of the Kansas Constitution. The penalty or remedy facing defendants violating criminal statutes is possible loss of liberty and/or property. The penalty or remedy facing defendants violating civil law is loss of property. Lumping the penalty or remedy with the means of determining liability, if valid, would, of necessity, be equally applicable under article 3 to all parties in civil and criminal jury trials.

The majority opinion states that the award of damages is to make the injured party whole by restoring him or her to the position he or she was in prior to the injury. The right to trial

by jury is then held to include the right of the jury to fix damages. By logical extension, this rationale would have to include actual recovery of the damages found by the jury. Limitations on collection would, therefore, be caught in the same common-law time warp. Presumably, any legislation which exceeds common-law limitations on collections of judgments would violate article 3 absent a quid pro quo. Many limitations on garnishments, executions, etc., would thus be unconstitutional as impairments of the injured party's right to be made whole. The federal bankruptcy act, itself, would be a major violation of the right to trial by jury.

The utilization of comparable fault or contributory negligence standards has a major bearing on the outcome of many cases. A negligent injured party has no recovery under contributory negligence standards. In a pure comparative fault jurisdiction, he or she recovers those damages caused by others. In Kansas, he or she recovers if his or her negligence is less than fifty percent. The standard to be applied is determined by the legislature. There is no serious argument that any particular standard is in a time warp.

The authority of the legislature to modify statutes of limitation is subject only to some minor restrictions. Punitive damages, treble damages, etc., are wholly within the legislative prerogative. What is an appropriate remedy for a wrong changes with the times.

Jury trials were totally eliminated by workers compensation laws. The quid pro quo requirement has validity here, as the right to have liability determined by a jury was removed—not just how damages were to be computed.

Much of what has previously been said applies equally to section 18. It speaks of remedy by due course of law. It does not require any particular remedy. "Due course of law" has no bearing on the issue herein.

In conclusion, I concur with the result reached in the majority opinion. I disagree that a finding of quid pro quo was necessary to reach that result.

HERD, J., dissenting: I respectfully disagree with the filing procedure and with the majority opinion. The procedure of filing

a brief opinion on March 30, 1989, with a formal opinion to follow
was bad practice in this case. At the time the brief opinion was
filed, the legislature was in session discussing the need for a
constitutional amendment to effect tort reform. The timing of the
opinion thrust this court into the legislative debate and left an
indication the decision was politically motivated. This undermines
public confidence in the independence and neutrality of the ju-
diciary. I would have treated this opinion as other opinions and
filed it in the ordinary course of Supreme Court work.

We now turn to the majority formal opinion. The statute in
question is the most recent of many efforts by the legislature to
accomplish "tort reform." The name is a misnomer. The effort
has not been to reform torts but to restrict the recovery of dam-
ages by the victim of a wrongdoer. The impetus to change the
methods of determining liability and damages for the negligent
injury to persons was brought about by the increase in the size
and frequency of judgments in tort actions in the past twenty
years. The increase is largely attributable to the following changes,
most of which are the result of a reform movement of the 1960s
and 1970s:

1. Abolition of contributory negligence as a defense.
2. Comparative negligence.
3. Adoption of strict liability in tort.
4. Abolition of the guest statute.
5. Abolition of governmental immunity.
6. Authorization of class actions.
7. Availability of expert witnesses.
8. Making juries representative of communities.
9. Public sensitivity to human rights.
10. Better trial techniques through use of demonstrative evidence.
11. Abolition of assumption of risk as a defense.
12. Inflation.

The proponents of "tort reform" actively opposed most of those
reforms even though they are considered to have promoted sub-
stantial justice. There has been great pressure on the legislature
for tort reform over the past several years. The legislature has
responded quite readily by enacting the Kansas Automobile Injury
Reparations Act (No Fault), K.S.A. 40-3101 *et seq.*, in 1974; and

by implementing in 1976 the Health Care Stabilization Fund, K.S.A. 40-3401 *et seq.*, the Medical Screening Panels, K.S.A. 65-4901 *et seq.*, and the shortened statute of limitations in medical malpractice cases, K.S.A. 60-513. Also in 1976 the legislature modified the collateral source rule for medical malpractice cases, K.S.A. 60-471; this statute was struck down in 1985. In 1985, a cap was placed on punitive damages, K.S.A. 1985 Supp. 60-3402, and another modification of the collateral source rule in medical malpractice cases was passed, K.S.A. 1985 Supp. 60-3403. The collateral source modification was again struck down. In 1986, the legislature passed House Bill 2661, L. 1986, ch. 299, § 13, which placed a total cap on recovery for medical malpractice at $1,000,000 and a cap of $250,000 on recovery for noneconomic loss. This cap was struck down in 1987. K.S.A. 1987 Supp. 60-19a01 was then passed, placing a cap on damages for pain and suffering. In 1988, the cap was extended to all noneconomic loss, K.S.A. 1988 Supp. 60-19a02. The latter two statutes are the subject of this opinion. As was well described in our opinion in *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 757 P.2d 251 (1988), none of these valiant efforts have produced the desired results. This is true because the statutes cannot attack the cause of the judgments. The cause is negligent injury of people. Wrongfully injured people are entitled to be adequately compensated by the wrongdoer for their injury.

In *Malpractice Victims*, we held that a $1,000,000 limit on total recovery and a limit of $250,000 on recovery for noneconomic loss in medical malpractice lawsuits violated §§ 5 and 18 of the Bill of Rights of the Kansas Constitution. In *Malpractice Victims*, we recognized that the legislature's limited power to modify the constitutional guarantees of a jury trial and a remedy by due course of law in actions recognized in the common law is tempered by due process requirements. We held the due process requirements could be met by substituting a viable statutory remedy for the constitutionally guaranteed plaintiff's right. 243 Kan. at 343-44. This is denominated a quid pro quo (this for that). We held K.S.A. 1987 Supp. 60-3407 failed to meet such requirement because medical malpractice plaintiffs did not receive anything in return for the statutory limitation on their right to a jury and a remedy by due course of law. We specifically rejected

the argument that a quid pro quo existed for the reason that medical malpractice plaintiffs were guaranteed recovery of their judgment due to the health care providers' required insurance coverage. Thus, the statutory requirement that the trial court enter judgment for $250,000, if the jury returned a verdict higher than that, offered nothing in exchange for taking away the constitutional guarantees.

It is axiomatic that, to satisfy the constitutional requirements in the present case, it must be shown that a substitute remedy is provided by K.S.A. 1988 Supp. 60-19a02 of sufficient benefit to plaintiff to balance the loss of plaintiff's constitutional rights. The majority accepts the defendant's argument that a sufficient quid pro quo is provided by what is claimed to be a restriction on the trial court's power to grant remittitur or a new trial even if the trial court believes the verdict is excessive or not supported by the evidence. This conclusion is erroneous.

Under the United States Constitution and the Kansas Constitution, interpreted by a long line of cases, the right to trial by jury includes the presence of a judge to determine the law of the case which carries with it the power to set aside a jury's verdict if it is not supported by the evidence. See *Capital Traction Co. v. Hof*, 174 U.S. 1, 13-14, 43 L. Ed. 873, 19 S. Ct. 580 (1899); *Ingram v. Howard-Needles-Tammen & Bergendoff*, 234 Kan. 289, 299, 672 P.2d 1083 (1983); *Kirk v. Beachner Construction Co., Inc.*, 214 Kan. 733, 736, 522 P.2d 176 (1974). This is basic to a jury trial and any interference with such judicial function is a violation of the separation of powers. A trial judge, inherently, has wide discretion in granting a new trial or setting aside a verdict when the jury verdict is excessive or so inadequate as to indicate passion and prejudice by the jury. *Smith v. Newell*, 210 Kan. 114, 117, 499 P.2d 1112 (1972).

Nowhere in K.S.A. 1988 Supp. 60-19a02 is there an indication of an intent by the legislature to attempt to eliminate a trial court's inherent right to order remittitur or grant a new trial. Placing a statutory limit on the amount of damages a personal injury victim may recover in no way affects the trial court's power to review the evidence in light of the jury verdict and determine whether the verdict is excessive or inadequate. If there were such legislative intent shown, it would be an unconstitutional

usurpation of the judicial function by the legislature and a violation of the separation of powers.

Now let us compare K.S.A. 1987 Supp. 60-3407, the statute we held unconstitutional in *Malpractice Victims,* with K.S.A. 1988 Supp. 60-19a02. Both statutes forbid the trial court to instruct the jury on the statutory limitations on recovery and each requires the court to enter a judgment of $250,000 for noneconomic loss when the jury verdict exceeds the limitation. The language in the two statutes is identical in this regard. Thus, the issue asserted here was present in *Malpractice Victims* and rejected. The issue in this case is indistinguishable from the issue in *Malpractice Victims.*

In *Malpractice Victims,* we stated a statutory cap limiting recovery in an action for personal injuries without an adequate substitute remedy acts as a compulsory, pre-established remittitur which forces a successful victim of negligent injury to bear part of this loss by having to forgo part of his jury award without his or her consent. 243 Kan. at 345. The result is the same in the present case. No matter how serious the jury determines the personal injury victim's noneconomic loss to be, the successful plaintiff may receive only a portion of the damage award. In weighing this issue, it is well to remember that defamation of character and disfigurement are good examples of noneconomic damages and that, if the legislature is granted authority to limit damages with no quid pro quo, it has the power to reduce them to $1.00 and its power is not restricted to noneconomic damages. The majority is drastically changing the constitutional scheme of due process by turning the trial of damage suits over to the legislative branch of government. Kansas Bill of Rights, § 5 provides: "The right to trial by jury shall be inviolate." According to Webster's New International Dictionary 1306 (2d ed. 1935), "inviolate" is defined as: "Not violated; unimpaired; unbroken; unprofaned."

K.S.A. 1988 Supp. 60-19a02 violates the Kansas Bill of Rights on the same rationale as we stated in *Malpractice Victims.* The majority should adhere to its noble words about stare decisis and follow the precedent of *Malpractice Victims.*

After conjuring up a fictitious quid pro quo for compromising both § 5 and § 18 of the Kansas Bill of Rights, the majority

opinion then abandons that theory and holds that a quid pro quo is unnecessary, stating: "The majority of this court recognizes that the legislature's decision to modify the common law, by setting a limit on noneconomic damages, is a legislative decision that does not violate our state constitution." This is an incorrect statement of the law, if followed it eliminates the judiciary's constitutional responsibility for due process in personal injury actions.

In *Kimball, et al, v. Connor, Starks, et al,* 3 Kan. 414, 432 (1866), we held the right to trial by jury applied only to cases triable at common law. The Kansas Constitution was adopted and ratified in 1859. Suits for damages for negligent personal injury were triable by jury at common law at that time. See *Tefft v. Wilcox,* 6 Kan. *46 (1870). Thus, the cases to which jury trials applied were fixed in 1859. Giving the legislature the authority to limit damages by changing the common law, or otherwise, violates § 5 of the Kansas Bill of Rights by taking the damage question away from the jury. A written constitution is adopted for the purpose of limiting the power of government. Providing that trial by jury shall be inviolate is a limitation on government as a protection of individual rights. There is no question the legislature has the power to change or abolish the common law. That, however, does not change the Kansas Constitution. A later change in the common law does not affect the meaning of § 5. Its meaning was fixed in 1859. The proper method of constitutional change is by amendment, not legislation. In *Marbury v. Madison,* 5 U.S. (1 Cranch) 49, 69 (1803), Chief Justice Marshall explained this issue well:

"The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing; if these limits may, at any time, be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation. It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or, that the legislature may alter the constitution by an ordinary act.

"Between these alternatives there is no middle ground. The constitution is either a superior, paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and like other acts, is alterable when the legislature shall please to alter it.

"If the former part of the alternative be true, then a legislative act contrary to the constitution is not law; if the latter part be true, then written constitutions are absurd attempts, on the part of the people, to limit a power in its own nature illimitable.

"Certainly all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation, and consequently the theory of every such government must be, that an act of the legislature repugnant to the constitution is void.

"This theory is essentially attached to a written constitution, and is consequently to be considered by this court as one of the fundamental principles of our society."

It is improper for an appellate court to permit a legislature to change the Constitution based on emergency or expediency. Prof. Bernard Schwartz, of New York University School of Law, in The Supreme Court 307 (1957), comments on this issue:

"A tribunal that molds its law only to fit the immediate demands of public sentiment is hardly fulfilling the role proper to the supreme bench in a system such as ours: 'The Court has no reason for existence if it merely reflects the pressures of the day,' " quoting from *Board of Education v. Barrette*, 319 U.S. 624, 665, 87 L. Ed. 1628, 63 S. Ct. 1178 (1943) (Frankfurter, J., dissenting).

16 Am. Jur. 2d, Constitutional Law § 96, p. 429, states:

"A state constitution has been described as a fundamental instrument, not to be stretched and strained to meet the exigencies and necessities of the moment, and as a basic instrument which is rigid and firm and will withstand the emotional upheavals of the time, in the interest of protecting continually the rights it guarantees."

The majority opinion amends the constitution and grants the legislature the power to determine damages in all personal injury actions. It is not limited to the facts in this case. We are making a grant of power without restriction. This is a major change of policy and should be approached with caution.

It has been often said that expediency is the worst enemy of a written constitution. In fact, written constitutions were conceived to avoid changing fundamental principles under the emotional upheavals of the time (expedient circumstances). Our action here is obviously in response to just such an emotional upheaval.

I would hold K.S.A. 1988 Supp. 60-19a01 and -19a02 unconstitutional.

ALLEGRUCCI, J., dissenting.