No. 74,412

STATE OF KANSAS, *Appellant*, v. MELVIN NEUFELD, *Appellee*.

(926 P.2d 1325)

Opinion filed November 8, 1996.

*Melanie S. Pfeifer,* assistant attorney general, argued the cause, and *Carla J. Stovall,* attorney general, was with her on the briefs for appellant.

*Mark L. Bennett, Jr.,* of Bennett & Dillon, L.L.P., of Topeka, argued the cause, and was on the brief for appellee.

*Robert Drean,* legal intern, and *Michael Kaye,* supervising attorney, of Washburn Law Clinic, of Topeka, were on the brief for *amicus curiae* Washburn Law Clinic.

The opinion of the court was delivered by

ABBOTT, J.: The State of Kansas appeals from the trial court's dismissal of blackmail charges against State Representative Melvin Neufeld. Neufeld cross-appeals. The case was dismissed by the trial court after both parties presented evidence at the preliminary hearing.

On the last night of the veto session of the 1994 legislative session, the bell which officially calls the Kansas House of Representatives to order for a vote was ringing. At that time, in the lobby of the House chamber, Representative Neufeld engaged Representative Richard Alldritt in a conversation.

The conversation took place in the lobby within 10 feet of the door to the House chambers. The lobby area of the House is sometimes used by legislators for the purpose of discussing and conducting "legislative business." The only business before the House was the omnibus appropriations bill that had to be passed before the legislature could adjourn. The defendant, Neufeld, is a Republican. Alldritt is a Democrat. Neufeld had been voting "Yes" on the omnibus bill and Alldritt had been voting "No" on the bill. According to Alldritt, Neufeld told him, "You're voting with us this time." Alldritt replied, "Excuse me?" Neufeld again stated, "You're voting with us this time. We know you were caught up in the [fifth floor] lounge in a compromising position with two [female] lobbyists earlier this evening. You're voting green or we'll call your wife." A green vote indicates a legislator is voting "Yes" on a bill. Alldritt testified that he considered Neufeld's statements a threat.

Alldritt testified that he did not respond to the defendant's threat. Instead, Alldritt walked into the House chamber and called his wife to advise her of the threat. A short time later, a vote was taken on the appropriations bill and Alldritt voted "No." Alldritt testified he had no intention of changing his vote as a result of Neufeld's statement and he did not do so at any time. His intention at all times was to vote "No."

After Alldritt voted "No" on the omnibus appropriations bill, a call of the House was taken. The bill had not passed and efforts were being made to salvage it. A call of the House means that no member can come into the chamber or leave the chamber unless he or she has permission of the Speaker or whoever is in the Speaker's chair. At this time, Alldritt was seated at his desk on the House floor, and he received a phone call from Neufeld, who was seated at his desk on the House floor. According to Alldritt, the defendant stated, "This is Melvin. What's going on? Don't you—you're not voting right?" Alldritt replied that he was voting red and that he

was not going to change his vote. Neufeld then stated, "Well, you know what this means." Alldritt replied, "Yeah, I know what this means," and hung up.

During the call of the House, Representative Ed McKechnie also received a telephone call from Neufeld. Neufeld told Mc-Kechnie that Alldritt had been caught in the fifth floor lounge in a very compromising situation. Neufeld advised McKechnie that they were going to pass the appropriations bill that night and that Alldritt needed to change his vote to green or "[w]e are going to call his wife and let her know he'd been caught in this compromising situation." Neufeld told McKechnie, "You need to make sure that Alldritt knows we're serious." McKechnie testified that it was his belief the purpose of the call was to have McKechnie communicate to Alldritt that if he did not change his vote from "No" to "Yes," a phone call would be made to Alldritt's wife telling her that·Alldritt had been caught in a compromising position.

A short time later, McKechnie received another telephone call from Neufeld, asking him if he had delivered the message to Alldritt. When McKechnie told him he had not, Neufeld replied, "Well, he needs to know that we're serious. He needs to know we're serious." After talking to Neufeld, McKechnie called Alldritt and asked him how he was doing. McKechnie told Alldritt that he understood what was going on and that Alldritt had to do what he had to do. McKechnie made no effort to change Alldritt's vote.

Alldritt's wife, Carmen Alldritt, testified that she received a call from Neufeld shortly before midnight near the end of the legislative session. Neufeld told her that he was sorry to have to call and tell her that her husband's conduct was unbecoming of a member of the House of Representatives. He advised her that he was concerned about her marriage and her husband's conduct. Neufeld advised her that her husband had been seen in a lounge with two women employees who stood to benefit from the passage of the bill on which they were voting. Mrs. Alldritt responded, "What do you want me to do now, call my husband up to get him to change his vote?" Neufeld replied, "Well, yes." Alldritt then received a phone call at his desk on the House floor from his wife, who was very upset. She advised Alldritt that Neufeld had called and told

her that there were problems in her marriage and that her husband was behaving in a way unfit for a legislator.

Alldritt testified that during the time of all these phone calls, the call of the House was still on, which would have allowed him to change his vote at any time until the final tally was taken. However, Alldritt did not change his "No" vote on the bill, and he had no intention of doing so. Ultimately, the bill failed to pass that evening. The bill passed the next day. Soon thereafter, Alldritt contacted the Speaker of the House, the House Majority Leader, and the Attorney General's office to report the defendant's conduct.

Alldritt did not speak with Neufeld again until after the legislative session had adjourned. At his home in Harper, Alldritt received a telephone call from Neufeld, who stated, "I'm calling to apologize. I did a really stupid thing. I'm a jerk and I hope you can forgive me."

Alldritt's wife also received a telephone call from Neufeld at her office in Anthony. Neufeld stated, "I'm calling to apologize for my actions the other evening. I was a jerk. I was out of line. My friends know I can be kind of off-the-wall at times." Mrs. Alldritt advised him that it was not the time or the place for the conversation, and if Neufeld wanted to talk with her any further, he could call her at home and she would tape-record the conversation. Neufeld did not make a follow-up call.

Alldritt testified that he felt the allegations made against him by the defendant caused him to be exposed to public ridicule, contempt, and degradation. Alldritt described meetings he had in his district in which constituents would avoid him or leave the room. He testified that his reputation was affected, and he believed the people in his district were also affected by the allegations. He and Neufeld were both subsequently reelected.

The language of the blackmail charge filed against Neufeld is important as it is involved in some of the issues raised on appeal, including an attempt to amend the complaint. The complaint alleged that Representative Neufeld blackmailed Representative Alldritt by "attempting to compel Richard Alldritt to act against his will, to-wit: to vote 'Yes' on an appropriations bill by threatening to communicate accusations or statements, . . . that Richard

Alldritt was in a 'compromising position' with two women, that would subject Richard Alldritt to public ridicule, contempt or degradation . . . ."

Neufeld filed a motion to dismiss. He alleged that his actions were privileged under Article 2, § 22 of the Kansas Constitution (Speech or Debate Clause) and under the common-law doctrine of legislative immunity. Further, Neufeld alleged that the blackmail statute (K.S.A. 21-3428) was unconstitutionally vague and overbroad and violated the First Amendment to the United States Constitution and § 11 of the Kansas Constitution Bill of Rights. On a pretrial ruling, the trial court ruled that Neufeld would not be allowed to present evidence of truth as a defense at the preliminary hearing in regards to the information which Neufeld used to allegedly blackmail Alldritt. The trial court also held that a legislator who makes a felonious threat for the purpose of influencing the official conduct of another legislator is not acting within a legitimate legislative sphere and that the Speech or Debate Clause of the Kansas Constitution does not immunize the legislator from criminal prosecution. Finally, the trial court ruled that the blackmail statute, K.S.A. 21-3428, is not unconstitutionally vague.

Next, the trial court held a preliminary hearing. Prior to the presentation of evidence, the defendant orally moved for a motion in limine prohibiting introduction of evidence which referred to comments made on the House floor regarding a bill being considered and voted on. The trial court denied the motion, stating that speech which amounts to a felonious act is outside the legitimate legislative function and not entitled to immunity. According to the trial court, the case which the defendant relied on in his immunity motion, *United States v. Johnson*, 383 U.S. 169, 15 L. Ed. 2d 618, 86 S. Ct. 749 (1966), has been criticized and modified in *Gravel v. United States*, 408 U.S. 606, 33 L. Ed. 2d 583, 92 S. Ct. 2614 (1972). In interpreting *Gravel*, the trial court found that there are some parameters beyond which a legislator cannot go and still be protected by immunity. As an example, the trial court reasoned that if a legislator stated with the proper intent, "If you vote for [this bill], I am going to kill you," then the legislator's actions would go beyond those legislative acts protected by immunity. The trial

court then found that it would be too difficult to draw a line between his hypothetical felony which would not be protected by immunity and other crimes which would be protected. Thus, the trial judge decided to draw the line between felony and misdemeanors. According to the trial court, if a legislator engages in speech which amounts to a misdemeanor, it may be protected by immunity, but if the speech amounts to a felonious act, then it is outside the legislative sphere and is not protected. Thus, the trial court found that the defendant's speech might amount to a felonious action and denied the defendant's motion in limine to exclude comments made on the House floor and in the House lobby.

At the preliminary hearing, the court allowed Neufeld's counsel to cross-examine Alldritt regarding what had transpired in the lounge on the evening in question. According to the court, this examination was only allowed to probe the credibility of the threat, not the truth of the allegations. On cross-examination, Alldritt testified that he had gone to the fifth floor lounge to rest around 7 or 8 p.m. Two female secretaries, who may have been associated with a lobbyist organization that had an interest in the appropriations bill, were also present in the lounge. The secretaries had brought hamburgers to the lounge for dinner. Alldritt testified that during the time he was in the lounge the doors were not locked and the lights were occasionally turned off because his eyes hurt. Alldritt testified that while the lights were off, the two secretaries were eating or talking on the phone.

Following presentation of the evidence at the preliminary hearing, Neufeld orally moved the court to dismiss the charge because the State had failed to present evidence to support all of the essential elements of the crime of blackmail. The blackmail statute at issue (K.S.A. 21-3428), a severity level 7 nonperson felony, states:

"Blackmail is gaining or attempting to gain anything of value or compelling another to act against such person's will, by threatening to communicate accusations or statements about any person that would subject such person or any other person to public ridicule, contempt or degradation."

In requesting dismissal of the charge, Neufeld alleged that the blackmail statute allows for two different strands of blackmail. The

first strand requires the defendant to gain or attempt to gain anything of value by threatening another. The second strand requires the defendant to actually compel another to act against his or her will. According to Neufeld, the "attempting" language only applies to the "gain value" strand and does not apply to the "compel" strand. Thus, Neufeld argued that the blackmail statute only punishes those who actually compel another to act against his or her will, not just attempt to compel one to act against his or her will. Neufeld then pointed out that the complaint only charged him with *attempting to compel* Alldritt to act against his will. Neufeld contended that the State presented no evidence that Alldritt had actually been compelled to do anything against his will. According to the evidence presented, Alldritt intended to vote "No" on the bill at all times and in fact voted "No" even after Neufeld allegedly threatened him.

On the other hand, the State argued that the blackmail statute prohibits one from compelling or attempting to compel another to act against his or her will. According to the State, blackmail occurs even if the result of the compulsion is not actually accomplished. Further, the State argued that if the blackmail statute required actual compulsion, then the court could and should bind the defendant over on the lesser offense of attempted blackmail. Finally, the State moved to amend the complaint so it could charge the defendant under the first strand of the blackmail statute which punishes a person for "gaining or attempting to gain anything of value" by a threat. The State argued that Neufeld threatened Alldritt in an attempt to gain a legislative vote, which is a thing of value.

Following these arguments, the trial court granted the defendant's motion to dismiss. The court found that an essential element of blackmail under the second strand is that the victim must have been actually compelled to act against his or her will. According to the trial court, if the threat was not successful in compelling the other person to act against his or her will, then the crime of blackmail has not been committed. The trial court ruled that the State had not presented any evidence to establish that Alldritt had actually been compelled to act against his will. The trial court also ruled that the general attempt statute is not applicable to the black-

mail statute. Finally, the trial court ruled that it would not allow the State to amend its complaint and allege the first strand of blackmail. In denying the motion to amend, the trial court found that a legislative vote is not a thing of value as contemplated by the legislature. In essence, the trial court held the legislature intended that a "thing of value" be tangible property, not intangible property. Thus, the trial court held that even if it allowed the State to amend its complaint and allege the alternative "value" strand, the evidence would still be insufficient to meet the State's burden and prove all of the essential elements of the crime.

The State then appealed, raising four issues. The State contends the trial court erred (1) in holding the alleged victim must be compelled to commit an act against his or her will in order to sustain the crime of blackmail; (2) in holding "attempted" blackmail is not a proper charge when the State alleges that the defendant attempted to compel the alleged victim to act against his or her will; (3) in holding a legislative vote is not a thing of value as contemplated in the blackmail statute; and (4) in not allowing the State to amend its complaint.

The defendant filed a cross-appeal, alleging his actions were privileged under Article 2, § 22, of the Kansas Constitution (Speech or Debate Clause) and the common-law doctrine of legislative immunity. The defendant also contends K.S.A. 21-3428 is unconstitutionally vague, ambiguous, and overbroad and/or is violative of the First Amendment to the United States Constitution and § 11 of the Kansas Constitution Bill of Rights.

## I. PRIVILEGE

Article 2, § 22 of the Kansas Constitution provides:

"**Legislative immunity**. *For any speech, written document or debate in either house, the members shall not be questioned elsewhere.* [Speech or Debate Clause] No member of the legislature shall be subject to arrest—except for treason, felony or breach of peace—in going to, or returning from, the place of meeting, or during the continuance of the session; neither shall he be subject to the service of any civil process during the session, nor for fifteen days previous to its commencement. [Arrest Clause]"

Similarly, Article I, § 6, of the United States Constitution provides in pertinent part:

"The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States. They shall in all Cases, except Treason, Felony, and Breach of Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same [Arrest Clause]; and for any Speech or Debate in either House, they shall not be questioned in any other Place [Speech or Debate Clause]."

There are two different protections provided by these Constitutional provisions. The Arrest Clause provides temporary protection from arrest for civil proceedings which may prohibit a legislator from attending a legislative session. Such protection does not apply to arrest for any criminal proceedings or to subpoenas for civil proceedings. See *Williamson v. United States*, 207 U.S. 425, 52 L. Ed. 278, 28 S. Ct. 163 (1908); *Gravel*, 408 U.S. 606. The privilege created by the Speech or Debate Clause prohibits the admission into trial of evidence which is protected by the clause. A legislator can be prosecuted for a crime occurring anywhere, but acts protected by the Speech or Debate Clause cannot be introduced as evidence against the legislator. The privilege at issue here is that provided by the Speech or Debate Clause.

The state common-law doctrine of legislative immunity and Article 2, § 22 of the Kansas Constitution provide protection to Kansas legislators equivalent to the protection provided to federal legislators under Article I, § 6 of the United States Constitution because they are based on the same origin and rationale. *State ex rel. Stephan v. Kansas House of Representatives*, 236 Kan. 45, 54, 687 P.2d 622 (1984). The cases analyzing the federal constitution are not binding on questions of state constitutional law, but they do provide guidance.

Two issues are immediately before us on the Speech or Debate Clause issue. They are whether words spoken immediately outside the chamber doors under the circumstances of this case are protected by the Speech or Debate Clause and whether the words spoken from within the chambers but over the telephone to a third person who is neither a legislator nor a staff member of the legislature are protected by the Speech or Debate Clause.

All of the cases we have found hold that the Speech or Debate Clause applies to words spoken within chambers and also to com-

mittee reports, resolutions, voting, and all things generally done in a legislative session in relation to the business at hand. *Hutchinson v. Proxmire*, 443 U.S. 111, 61 L. Ed. 2d 411, 99 S. Ct. 2675 (1979); *United States v. Helstoski*, 442 U.S. 477, 61 L. Ed. 2d 12, 99 S. Ct. 2432 (1979); *Davis v. Passman*, 442 U.S. 228, 60 L. Ed. 2d 846, 99 S. Ct. 2264 (1979); *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 44 L. Ed. 2d 324, 95 S. Ct. 1813 (1975); *Scheuer v. Rhodes*, 416 U.S. 232, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974); *Doe v. McMillan*, 412 U.S. 306, 36 L. Ed. 2d 912, 93 S. Ct. 2018, *motion for clarification denied* 419 U.S. 1043 (1973); *Gravel*, 408 U.S. 606; *United States v. Brewster*, 408 U.S. 501, 33 L. Ed. 2d 507, 92 S. Ct. 2531 (1972); *Powell v. McCormack*, 395 U.S. 486, 23 L. Ed. 2d 491, 89 S. Ct. 1944 (1969); *Dombrowski v. Eastland*, 387 U.S. 82, 18 L. Ed. 2d 577, 87 S. Ct. 1425 (1967); *Johnson*, 383 U.S. 169; *Kilbourn v. Thompson*, 103 U.S. 168, 26 L. Ed. 377 (1880).

Here, the first exchange between Neufeld and Alldritt occurred within 10 feet of the door to the House chambers. The two were entering the House chambers in response to a bell calling the House to order for a vote on the only pending legislation remaining before the House. The second exchange between Neufeld and Alldritt occurred on the House floor between two legislators over their desk phones, again regarding the only pending legislation before the House. Under the facts, we are satisfied the exchanges between Neufeld and Alldritt are subject to the Speech or Debate Clause. Based on this same rationale, the Speech or Debate Clause also applies to the exchange between Neufeld and Representative McKechnie which occurred on the House floor.

The exchange between Neufeld and Mrs. Alldritt is a different matter. Mrs. Alldritt is not a representative or legislative staff member. She was not appearing before the legislature or a legislative body. She had no stake in the outcome of the vote different than other citizens of this state. We are unable to say that Neufeld's phone call to Mrs. Alldritt, who is not a legislator or a member of the legislator's staff, constitutes a legislative act so as to be protected by the Speech or Debate Clause. As such, the exchange between Neufeld and Mrs. Alldritt would be admissible evidence in a blackmail prosecution against Neufeld. The apology phone

calls made to the Alldritts after the legislative session had adjourned would also be admissible evidence in a blackmail prosecution against Neufeld.

However, as we view the testimony regarding the threatening phone call to Mrs. Alldritt and the apology phone calls, this testimony is insufficient to provide probable cause to believe Neufeld committed the crime charged. Since the exchanges between Neufeld, Alldritt, and McKechnie are inadmissible evidence, there is no evidence to bind Neufeld over for trial, and the trial court did not err in dismissing the case, even though we might not agree with the trial.judge's reasons for doing so.

An expanded rationale, discussing why the conversations between Neufeld, Alldritt, and McKechnie are covered by the Speech or Debate Clause of the Kansas Constitution so as to exclude those communications from being introduced into evidence against Neufeld, is discussed below. A review of applicable cases is helpful in deciding this issue.

*State ex rel. Stephan v. Kansas House of Representatives*, 236 Kan. at 54, is the only case decided by this court dealing with the Kansas Constitution's Speech or Debate Clause. *Stephan* was an action in quo warranto and mandamus brought by the State against the Kansas House of Representatives, the Kansas Senate, and the Kansas governor, seeking a determination of the constitutionality of K.S.A. 1983 Supp. 77-426(c) and (d). This statute provided that the legislature may adopt, modify, or revoke administrative rules and regulations by concurrent resolutions passed by the legislature without presentment to the governor. The legislature filed a motion to dismiss the action, alleging that all state legislators are protected from liability based on the performance of legitimate legislative functions under the common-law doctrine of legislative immunity which is embodied in the Speech or Debate Clause of the Kansas Constitution. Since Kansas had never interpreted the Speech or Debate Clause before, this court relied on several United States Supreme Court cases which have addressed the issue.

This court found that the purpose of the Speech or Debate Clause is to insure that legislators may perform legislative functions independently, free from outside interference or fear of such in-

terference. To preserve legislative independence, legislators " 'should be protected not only from the consequences of litigation's results but also from the burden of defending themselves.' " 236 Kan. at 55 (quoting *Supreme Court of Va. v. Consumers Union*, 446 U.S. 719, 731-32, 64 L. Ed. 2d 641, 100 S. Ct. 1967 [1980]). " '[T]he "central role" of the Clause is to "prevent intimidation of legislators by the Executive and accountability before a possible hostile judiciary." [As such,] the Clause provides protection against civil as well as criminal actions, and against actions brought by private individuals as well as those initiated by the Executive Branch.' " 236 Kan. at 56 (quoting *Eastland*, 421 U.S. at 502-03). Legislative immunity was not written into the Kansas Constitution for the purpose of protecting the private or personal benefits of legislators. Rather, immunity was provided to " ' "protect the integrity of the legislative process by insuring the independence of individual legislators." ' " 236 Kan. at 55 (quoting *Eastland*, 421 U.S. at 502-03, quoting *Brewster*, 408 U.S. at 507). Further, legislative immunity was developed to reinforce the carefully established separation of powers doctrine. The Speech or Debate Clause is to be read broadly to carry out these purposes. 236 Kan. at 56 (citing *Eastland*, 421 U.S. at 501; and *Johnson*, 383 U.S. at 180).

The first case in which the United States Supreme Court addressed the Speech or Debate Clause was in *Kilbourn v. Thompson*, 103 U.S. 168. In *Kilbourn*, the plaintiff sued, among others, some members of the United States House of Representatives for false imprisonment. The suit was based on the passage of a resolution which allowed the plaintiff to be taken into custody for being in contempt of the House. The representatives being sued, who voted to pass the resolution, claimed that they were immune from the suit because it was based on conduct which occurred while they were acting in their legislative capacity. The Court found that if the representatives had committed these actions under ordinary circumstances, then they would be liable for false imprisonment. However, the Court pointed out that a representative who carries out his or her duties in the House of Representatives is not acting under ordinary circumstances. Thus, the Court held the representatives were protected from liability by the Speech or Debate

Clause. Notwithstanding this holding, the Court cautioned that conduct by Representatives would not always be protected. The Court stated:

"It is not necessary to decide here that there may not be things done, in the one House or the other, of an extraordinary character, for which the members who take part in the act may be held legally responsible. If we could suppose the members of these bodies [go] so far to forget their high functions and the noble instrument under which they act as to imitate the Long Parliament in the execution of the Chief Magistrate of the nation, or to follow the example of the French Assembly in assuming the function of a court for capital punishment, we are not prepared to say that such an utter perversion of their powers to a criminal purpose would be screened from punishment by the constitutional provision for freedom of debate." 103 U.S. at 204-05.

The *Kilbourn* case ruled that protection under the Speech or Debate Clause applies to "things generally done in a session of the House by one of its members in relation to the business before it." 103 U.S. at 204. Similarly, this court has stated that legislators are absolutely protected from the burden of defending lawsuits if the conduct upon which the suit is based falls within "the sphere of legitimate legislative activity." *Stephan*, 236 Kan. at 57.

" 'In determining whether particular activities other than literal speech or debate fall within the *"legitimate legislative sphere"* we look to see whether the activities took place "in *a session of the House by one of its members in relation to the business* before it." *Kilbourn v. Thompson*, 103 U.S. at 204. More specifically, we must determine whether the activities are

" ' "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel v. United States*, 408 U.S. at 625.' " *Stephan*, 236 Kan. at 56 (quoting *Eastland*, 421 U.S. at 503-04). (Emphasis added.)

This rule defining what conduct is or is not protected by the Speech or Debate Clause is simple enough. The difficulty arises in attempting to apply the rule.

Neufeld points out that the blackmail acts which he allegedly committed were done (1) while he was serving in his capacity as a duly elected Kansas state representative, (2) in the course of performing his legislative duties, and (3) on the floor of the House of

Representatives during the debate and vote on a specific bill. Thus, Neufeld contends that any statements made by him were done during a session of the Kansas House of Representatives and were made in relation to business before the House at that time. Neufeld points out that legislators are frequently asked, under a great deal of pressure, to put aside their personal will and vote in a certain way on a bill. Further, Neufeld contends that these vote requests are often accompanied by threats that the wrong vote will result in a harsh editorial, letters to the editor, negative campaigning, loss of campaign support (financial or otherwise), or loss of a coveted chairmanship or committee assignment. Thus, Neufeld contends that his alleged threatening contacts to secure a vote were immune from liability because, as is often done, he contacted Alldritt and McKechnie as a voting representative in relation to business pending before the House of Representatives.

The State agrees with Neufeld that legislators are protected from liability if they act within the sphere of legitimate legislative activity, but the State points out that this privilege does not extend to instances where conduct is unrelated to the functioning of the legislative process. See *Johnson*, 383 U.S. at 172; *Tenney v. Brandhove*, 341 U.S. 367, 376, 95 L. Ed. 2d 1019, 71 S. Ct. 783 (1951). The State disagrees with Neufeld's analysis of what type of conduct falls into the sphere of legitimate legislative activity. According to the State, even if acts are done in a legislator's official capacity, they are not necessarily "legislative" in nature. See *McMillan*, 412 U.S. at 313; *Gravel*, 408 U.S. at 625.

Accordingly, the State contends that blackmail does not relate to a legitimate legislative function. It argues that the crime of blackmail is not an integral or essential part of the legislative process. Rather, the act is only peripherally related to the legislative office and should not be protected from prosecution. *Brewster*, 408 U.S. at 520. The State points out that the discussions between Neufeld, Alldritt, and McKechnie were not open to the House of Representatives. Instead, the threats were communicated in a secretive manner. Further, the contacts did not constitute a debate. Thus, the State contends Neufeld's contacts with Alldritt and McKechnie were not for the purpose of legitimate debate of the issues sur-

rounding the legislation then pending in the House. Rather, the contact made was to compel Alldritt to vote contrary to his intentions, to cause marital discord, and to encourage Alldritt's wife to ask her husband to change his vote. The State contends that the Kansas Constitution was not meant to protect such conduct.

In fact, the State contends that allowing the defendant's conversations with Alldritt and McKechnie to be inadmissible evidence at the defendant's blackmail prosecution is contrary to the purpose of the Speech or Debate Clause. The clause is meant to preserve legislative integrity. *Stephan*, 236 Kan. at 55. However, according to the State, granting protection to the defendant from prosecution for criminal blackmail poses a threat to legislative integrity. The State reasons that blackmail is contrary to democratic ideals and principles. It cheats the public of its right to honest representation by the victim of the blackmail. The State contends that forcing a duly elected representative to change his or her vote under criminal threat constituting blackmail is repugnant to our system of government, and that the defendant's illegal act is not in furtherance of a free and open legislative debate, but is in degradation of it. Further, the State reasons, protection from criminal blackmail would indicate that politicians are free to breach the law.

Finally, the State takes issue with the defendant's argument that his alleged conduct was similar to asking a legislator to put aside his or her personal will for the good of passing a bill. The State concedes that legitimate political debate results in pressure on legislators, such as editorials, negative campaigning, and loss of campaign support to vote in a particular manner. However, the State contends that blackmail is not the same type of pressure as a harsh editorial and cannot be compared to it. Thus, the State argues that Neufeld was not addressing Alldritt as a voting representative in relation to business pending before the House, but was addressing Alldritt as a victim in relation to threats constituting blackmail.

The United States Supreme Court has decided four cases addressing how the Speech or Debate Clause applies to the criminal prosecution of a Congressman. *Johnson*, 383 U.S. 169; *Brewster*, 408 U.S. 501; *Gravel*, 408 U.S. 606; *Helstoski*, 442 U.S. 477.

In *Johnson*, 383 U.S. 169, a former Congressman was convicted in federal district court for, *inter alia*, one count of conspiring to defraud the United States in violation of a general criminal statute, 18 U.S.C. § 371. The conspiracy involved an agreement between the Congressman and a savings and loan institution. In exchange for money from the savings and loan, the Congressman agreed to exert his influence over the Department of Justice and convince it to dismiss a mail fraud indictment against the savings and loan's officers. The important act, as far as the issue before us is concerned, is that as a part of the agreement, the Congressman read a speech favorable to independent savings and loan associations in the House. The savings and loan officers apparently wrote the speech for the Congressman, and they distributed copies of the speech to allay fears of potential depositors.

The Court found that the improper influence over the Department of Justice, occurring outside of the House floor, did not involve the legislative process and did not implicate the Speech and Debate Clause. The Court only addressed whether the Congressman could be prosecuted under the broad conspiracy statute for his improperly motivated speech given on the House floor. The Court pointed out that the theory of the State's criminal prosecution depended upon certain sentences in the speech, the reasons for their inclusion, the Congressman's personal knowledge of the facts in the speech, and the Congressman's motive for giving the speech. The Court stated:

"The attention given to the speech's substance and motivation was not an incidental part of the Government's case, which might have been avoided by omitting certain lines of questioning or excluding certain evidence. The conspiracy theory depended upon a showing that the speech was made solely or primarily to serve private interests, and that [the Congressman] in making it was not acting in good faith, that is, that he did not prepare or deliver the speech in the way an ordinary Congressman prepares or delivers an ordinary speech." 383 U.S. at 176-77.

The Government argued that it was prosecuting the Congressman for the conspiracy which resulted in the speech, not for the speech itself. The Government's argument failed. Finding that the indictment focused on the motives underlying the making of the speech and upon its contents, the Court held "that a prosecution

under a general criminal statute dependent on such inquiries necessarily contravenes the Speech or Debate Clause." 383 U.S. at 184-85. However, the Court made it clear that the Clause did not apply to criminal prosecution of a legislator if the prosecution did "not draw in question the legislative acts of the defendant member of Congress or his motives for performing them." 383 U.S. at 185.

The Court did not dismiss the conspiracy charge against the defendant in its entirety. Instead, the Court sent the case back for a new trial, requiring that all references to the speech be eliminated. All other evidence of conspiracy which did not occur on the House floor was admissible at the new trial.

The State attempts to distinguish *Johnson*. According to the State, the criminal prosecution for blackmail against Neufeld does not rely on legislative acts performed by Neufeld or his motivation behind such acts. Instead, the State argues that it is prosecuting the defendant for a threat, not for vote negotiation techniques. We disagree.

It is not the alleged criminal act that is examined to determine whether it falls within the sphere of legislative action and whether the legislator's conduct qualifies as a legislative act. If this court looked only at the specific act in question and determined that the act constituted a crime and was not entitled to protection as a legitimate legislative act, then the constitutional protection afforded by the Speech or Debate Clause would not serve its intended purpose. Rather, this court should look at the context in which the conduct occurred to determine whether it falls within a legitimate legislative sphere.

Here, the omnibus appropriations bill was the only issue before the legislature and was currently being acted on when the words at issue were spoken by the defendant. While Neufeld's threat was not delivered in the course of a regular speech or while addressing the chair, the statements were made on the House floor during a session and related to the appropriations bill, which was the only matter under discussion on the House floor. Trying to persuade a representative to change his or her vote is an integral part of the communicative processes by which members participate in House proceedings with respect to the passage or rejection of proposed

legislation. *Gravel*, 408 U.S. at 625. "It has been held that the passing of acts and resolutions is the very essence of the legislative process." *Stephan*, 236. Kan. at 56 (citing *Eslinger v. Thomas*, 476 F.2d 225, 228 [4th Cir. 1973]). This prosecution focuses on the content and motive of words spoken by a legislator on the House floor while he was trying to convince another legislator to vote a certain way on a bill. Thus, under *Johnson*, the Speech or Debate Clause precludes introduction of evidence relating to words spoken on the House floor, because the words related to a legislative act which falls within a legitimate legislative sphere.

It is true that the techniques used by the defendant in an effort to persuade Alldritt to change his vote were, if not criminal, at least unethical. However, if a legislator's conduct falls within a legitimate legislative sphere, legality of the conduct is not a primary concern. See *McMillan*, 412 U.S. at 312-13 ("Congressmen . . . are immune from liability for their actions within the 'legislative sphere,' [citation omitted] even though their conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes."); *Tenney*, 341 U.S. at 377 ("The claim of an unworthy purpose does not destroy the privilege."); *Kilbourn*, 103 U.S. at 202 (finding that the act would constitute false imprisonment if it did not occur in the House, but it did occur in the House so it is protected).

Five years after *Johnson*, the Supreme Court revisited the Speech or Debate Clause in *United States v. Brewster*, 408 U.S. 501, 33 L. Ed. 2d 507, 92 S. Ct. 2531 (1972). In *Brewster*, a former United States Senator was charged, under 18 U.S.C. § 201(c)(1), (g), with accepting bribes in exchange for his promise to perform certain official acts as a member of Congress. The indictment alleged that the Senator, while a member of the Senate Committee on Post Office and Civil Service, received money in return for his promise that he would vote a certain way in the future on postage rate legislation which might be pending before him in his official capacity. The defendant moved to dismiss the indictment, alleging that he was immune from prosecution for bribery under the Speech or Debate Clause.

The *Brewster* Court then addressed its decision in *Johnson*. It pointed out that while *Johnson* dealt with a general criminal statute prohibiting conspiracy, in *Brewster*, the statute at issue was a narrowly drawn statute passed by Congress in the exercise of its power to prohibit its own members from participating in bribery. Further, the *Brewster* Court pointed out that the *Johnson* case only affected criminal prosecutions which drew into question the legislative acts or motivations for such acts.

In *Brewster*, the Court ruled that a legislator may be prosecuted for criminal conduct which is not itself a legislative act but is related to a legislative act. 408 U.S. at 521. The Court concluded that the Executive Branch could prosecute the legislator for his promise, not made on the chamber floor, to do a legislative act in the future in return for a bribe. The Court ruled that the particular prosecution at issue was proper because it was not necessary to inquire into how the Senator spoke, debated, voted, or anything he did in the chamber or committee in order to make out a violation of the statute. In allowing the Senator to be prosecuted for his conduct, the Court stated:

"Taking a bribe is, obviously, not part of the legislative process or function; it is not a legislative act. It is not, by any conceivable interpretation, an act performed as a part or even incidental to the role of a legislator. It is not an 'act resulting from the nature, and in the execution, of the office.' Nor is it a 'thing said or done by him, as a representative, in the exercise of the functions of that office,' [citation omitted]. Nor is inquiry into a legislative act or the motivation for a legislative act necessary to a prosecution under this statute or this indictment." 408 U.S. at 526.

In conclusion, the Court reiterated that, under *Johnson*, legislative acts or acts falling into a legitimate legislative sphere are protected by the Speech or Debate Clause and evidence of such conduct is inadmissible at a criminal trial. In *Brewster*, the Court simply refined this rule and held that the Speech or Debate Clause does "not prohibit inquiry into activities that are casually or incidentally related to legislative affairs but not a part of the legislative process itself." 408 U.S. at 528.

It could be argued, under *Brewster*, that Neufeld's threat was merely a political act related to the legislative act of voting and was not a legislative act itself, thus prosecution of the conduct should

be allowed. A majority of this court believes *Brewster* is distinguishable from the case at hand. Neufeld's conduct occurred on the House floor and was an attempt to persuade a vote change on a bill which was before the House. In *Brewster*, the punishable act was the taking of money for a promise to do something in the future. In order to prove the criminal act, it was not necessary to inquire into whether the promise to perform the legislative act of voting a certain way on future legislation came to pass. Here, the punishable conduct before the House was an attempt to get Alldritt's "Yes" vote on the only legislative bill before the House. Inquiry into how the defendant spoke and what he said in the House to fellow Representatives Alldritt and McKechnie is necessary to make out a violation of this statue. See *Brewster*, 408 U.S. at 526 ("The question is whether it is necessary to inquire into how appellee spoke . . . or anything he did in the chamber or in committee in order to make out a violation of this statute.").

Further, *Brewster* is distinguishable because it involved a narrow statute specifically aimed at punishing legislators for taking bribes. If the legislator's conduct was found to be a legislative act and immune from prosecution, then the bribery statute's effect would have been greatly minimized. Here, Neufeld was charged under a general blackmail statute. We do not believe that the legislature contemplated application of the statute to conduct occurring on the House floor at the time the statute was promulgated.

Neufeld's conduct was within the legitimate legislative sphere because it took place in a session of the House on the House floor and was in relation to the appropriations bill which was the business before the House. See *Kilbourn*, 103 U.S. at 204. The attempt to persuade another legislator to change his or her vote on the House floor while the bill is being voted on is "an integral part of the deliberative and communicative processes by which Members participate in . . . House proceedings with respect to the . . . passage or rejection of proposed legislation . . . ." *Gravel*, 408 U.S. at 625.

Any comments made by Neufeld to another member of the House on the House floor concerning how to vote on the only bill under consideration should not be introduced as evidence at a

criminal blackmail trial. Neufeld's conduct was possibly criminal and clearly unethical. That, however, does not override the constitutional protection necessary to afford an open exchange between legislators. The public is not without a remedy. The legislature is free to sanction Neufeld as it chooses, and the voters have a remedy if they desire to exercise it.

*Gravel*, decided the same day as *Brewster*, is the case which the trial court in this case relied on when it denied the defendant's motion in limine based on the Speech or Debate Clause. *Gravel* centered on a Senator, the Chairman of the Subcommittee on Buildings and Grounds of the Senate Public Works Committee, who convened a meeting of the subcommittee. At this subcommittee meeting, the Senator read extensively from a copy of the study entitled History of the United States Decision-Making Process on Viet Nam Policy (Pentagon Papers), which bore a Defense security classification of Top Secret-Sensitive. The Senator then placed the entire 47 volumes of the study into the public record. Sometime later, the press reported that the Senator had arranged for the study to be published by Beacon Press and that his staff had talked to the editor of M.I.T. Press.

As a result of this conduct, a federal grand jury was convened to investigate possible criminal conduct with respect to the release and publication of the Pentagon Papers. The crimes being investigated included the retention of public property or records with intent to convert (18 U.S.C. § 641), the gathering and transmitting of national defense information (18 U.S.C. § 793), the concealment or removal of public records or documents (18 U.S.C. § 2071), and conspiracy to commit such offenses and to defraud the United States (18 U.S.C. § 371). Two of the witnesses subpoenaed were an assistant to the Senator, who had been added to the Senator's staff the day of the subcommittee meeting, and the editor of M.I.T. Press. The Senator intervened and filed motions to quash the subpoenas. He alleged that requiring these witnesses to appear and testify would violate his privilege under the federal Speech or Debate Clause.

The Senator claimed that his staff shared his constitutional legislative immunity privilege under the Speech or Debate Clause.

Thus, the Court first considered whether the Senator himself would be immune, under the Speech or Debate Clause, from an inquiry by a grand jury investigating the commission of a crime. In considering this issue, the Court stated: "We have no doubt that Senator Gravel may not be made to answer—either in terms of questions or in terms of defending himself from prosecution—*for the events that occurred at the subcommittee meeting.*" 408 U.S. at 616. (Emphasis added.) In so holding, the Court cited the typical rule that the Speech or Debate Clause and the definition of a legislative act should be read broadly.

"The Clause . . . speaks only of 'Speech or Debate,' but the Court's consistent approach has been that to confine the protection of the Speech or Debate Clause to words spoken in debate would be an unacceptably narrow view. Committee reports, resolutions, and the act of voting are equally covered; '[i]n short, . . . things generally done in a session of the House by one of its members in relation to the business before it.' *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1881), quoted with approval in *United States v. Johnson*, 383 U.S. at 179. Rather than giving the Clause a cramped construction, the Court has sought to implement its fundamental purpose of freeing the legislator from executive and judicial oversight that realistically threaten to control his conduct as a legislator." 408 U.S. at 617-18.

According to the *Gravel* Court, the Clause does not "privilege illegal or unconstitutional conduct beyond that essential to foreclose executive control of legislative speech or debate and associated matters such as voting and committee reports and proceedings." 408 U.S. at 620. Thus, protection does not attach if punishment can be imposed without the need to prove a legislative act or the motive underlying a legislative act. Based on these rules, the Court held that neither the Senator nor his aide could be questioned elsewhere for the conduct which occurred at the committee meeting.

However, the Court found that the Senator's alleged arrangement with Beacon Press to publish the Pentagon Papers was not protected by the Speech or Debate Clause and that he or his staff could be questioned elsewhere regarding this conduct. In so holding, the Court summarized the evolution of legislative immunity:

"[V]oting by Members and committee reports are protected; and we recognize today—as the Court has recognized before [citations omitted], that a Member's

conduct at legislative committee hearings, although subject to judicial review in various circumstances, as is legislation itself, may not be made the basis for a civil or criminal judgment against a Member because that conduct is within the 'sphere of legitimate legislative activity.' [Citation omitted.]

"[T]he Clause has not been extended beyond the legislative sphere. That Senators generally perform certain acts in their official capacity as Senators does not necessarily make all such acts legislative in nature. Members of Congress are constantly in touch with the Executive Branch of the Government and with administrative agencies—they may cajole, and exhort with respect to the administration of a federal statute—but such conduct, though generally done, is not protected legislative activity. . . .

"Legislative acts are not all-encompassing. The heart of the Clause is speech or debate in either House. *Insofar as the Clause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation* or with respect to other matters which the Constitution places within the jurisdiction of either House. As the Court of Appeals put it, the courts have extended the privilege to matters beyond pure speech or debate in either House, but 'only when necessary to prevent indirect impairment of such deliberations.' *United States v. Doe*, 455 F.2d at 760.

. . . .

". . . While the Speech or Debate Clause recognizes speech, voting and other legislative acts as exempt from liability that might otherwise attach, it does not privilege either Senator or aide to violate an otherwise valid criminal law in preparing for or implementing legislative acts." 408 U.S. at 624-26. (Emphasis added.)

Legislators attempting to influence other legislators' votes is an integral part of the deliberative and communicative processes by which members participate in House proceedings with respect to passage or rejection of proposed legislation. See *Gravel*, 408 U.S. at 624-26. A majority of this court find that exposing legislators to liability if their vote negotiation tactics should cross the line of legality will chill legislators from vigorously negotiating votes and will indirectly impair bill deliberations.

*United States v. Helstoski*, 442 U.S. 477, 61 L. Ed. 2d 12, 99 S. Ct. 2432 (1979), is the last case in which the Supreme Court has addressed how the Speech or Debate Clause applies to criminal conduct. In *Helstoski*, the defendant was a former member of the United States House of Representatives. While he was a Repre-

sentative, the Justice Department began investigating allegations that aliens paid the Representative money so he would introduce private bills that would suspend the application of immigration laws so as to allow the aliens to remain in this country. The grand jury returned an indictment, charging the Representative with various criminals acts. The Representative moved to dismiss the indictment, contending that the indictment violated the Speech or Debate Clause.

The Court distinguished this Representative's past legislative acts from Brewster's promises to do a legislative act in the future, finding that any reference to past legislative acts was not admissible at the criminal trial. 442 U.S. at 488-89. In so holding, the Court stated:

> "As to what restrictions the Clause places on the admission of evidence . . . our concern is whether there is mention of a legislative act. To effectuate the intent of the Clause, the Court has construed it to protect other 'legislative acts' such as *utterances in committee hearings* and reports. *E.g., Doe v. McMillan*, 412 U.S. 306 (1973). But it is clear from the language of the Clause that protection extends only to an act that has already been performed. A promise to deliver a speech, to vote, or to solicit other votes at some future date is not "speech or debate." Likewise, a promise to introduce a bill is not a legislative act." 442 U.S. at 490. (Emphasis added.)

Again, under *Helstoski*, it could be argued that Neufeld's conduct should be construed as simply a promise to carry out a threat if Alldritt did not vote "Yes" on the appropriations bill. Looked at in this light, Neufeld's conduct is not a legislative act and is not entitled to immunity. However, the United States Supreme Court found that "utterances in committee hearings" are legislative acts, without even looking at the content of the utterance. In this case, surely an utterance on the House floor, relating to a vote on a bill currently being voted on, is also a legislative act regardless of its content.

In summary, we are of the opinion that the conversations among Neufeld, Alldritt, and McKechnie are protected by the Speech or Debate Clause and cannot be introduced as evidence in a criminal blackmail prosecution against Neufeld. As we view the record absent this evidence, the State has no evidence to prove the alleged

crime, and thus the trial court did not err in dismissing the case. Having so concluded, there is no reason to review the remaining issues.

Finally, we will comment on the dissent's discussion of an attempt to amend Article 2, § 22 at the Wyandotte Constitutional Convention. We do not know why the proposed amendment was rejected. Perhaps it was rejected as redundant, since the clause already provided that protection. What is clear is that if the dissent is correct, a legislator may be sued civilly or charged criminally for a word or words spoken in the House or Senate. The dissent's interpretation that by rejecting the amendment, the legislature intended that any word or words spoken in either house of the legislature can be the foundation of any action, complaint, or prosecution effectively eliminates the Speech or Debate Clause by removing all immunity of any kind for any word or words spoken in the House or Senate by a legislator.

Article 2, § 22 demonstrates that the reporting of the Wyandotte Constitutional Convention is not always full and complete concerning the history of the Kansas Constitution. We note that the Speech or Debate Clause of Article 2, § 22, as adopted, also applies to a "written document." How those words found their way into the Kansas Constitution is not revealed or at least not indexed sufficiently that we can find it.

Affirmed.

LOCKETT, J., dissenting: I respectfully dissent from the majority's finding that Representative Neufeld's alleged criminal threats of blackmail to Representatives Alldritt and McKechnie are protected by Article 2, § 22 of the Kansas Constitution (Speech or Debate Clause) and cannot be introduced as evidence in the criminal blackmail prosecution against Neufeld.

In reaching its conclusion, the majority acknowledges Neufeld's statement that legislators are frequently pressured to put aside their personal will and vote in a certain way on a bill. The majority notes Neufeld's declaration that these pressures to vote a certain way are often accompanied by threats that the wrong vote will result in harsh editorials, letters to the editor, negative campaign-

ing, loss of campaign support (financial or otherwise), or loss of a coveted chairmanship or committee assignment. The majority agrees with Neufeld's assertion that his alleged criminal threats to secure a vote did not subject him to criminal responsibility because his threats to another legislator related to a vote upon business pending before the House of Representatives. After accepting this assertion, the majority concludes that Neufeld's alleged criminal attempt to persuade another legislator to change his vote on the House floor while a bill was being voted on was "an integral part of the deliberative and communicative processes by which Members participate in . . . House proceedings with respect to the . . . passage or rejection of proposed legislation . . . .," *Gravel v. United States*, 408 U.S. 606, 625, 33 L. Ed. 2d 583, 92 S. Ct. 2614 (1972).

The majority declares that even a criminal threat of blackmail to influence a vote on the House floor does not override the constitutional protection which the Speech or Debate Clause affords to open exchanges between legislators. Following this reasoning, the majority determines that any criminal threats made by Neufeld to another member of the House on the House floor concerning how to vote on a bill under consideration cannot be introduced as evidence in his criminal trial.

After determining that the framers of the Kansas Constitution intended the Kansas Legislature to be above the law and to secure legislators from criminal prosecution for felony crimes occurring within the sanctuary of the House chambers, the majority observes that a citizen's (or a legislator's) only protection from a legislator who commits such crimes is the legislative power to sanction the legislator if the legislature chooses and the voters' power of the ballot if the voters desire to exercise that right. It concludes:

"[W]e are of the opinion that the conversations among Neufeld, Alldritt, and McKechnie are protected by the Speech or Debate Clause and cannot be introduced as evidence in a criminal blackmail prosecution against Neufeld. As we view the record absent this evidence, the State has no evidence to prove the alleged crime, and thus the trial court did not err in dismissing the case."

I agree that Kansas legislators are provided immunity if they act within the sphere of legitimate legislative activity. However, I dis-

agree with the majority's analysis and its conclusion that any conduct, however reprehensible, by a legislator to influence a vote on the floor of either House of the Kansas Legislature falls within the protection accorded to legitimate legislative activity and that the Speech or Debate Clause of the Kansas Constitution prohibits the admission into a criminal trial of evidence of a criminal threat or criminal conspiracy committed on the House or Senate floor. Rather, I find that the constitutional immunity granted in the Speech or Debate Clause does not extend to instances of criminal acts unrelated to the legitimate functioning of the legislative process. See *United States v. Johnson*, 383 U.S. 169, 172, 15 L. Ed. 2d 681, 86 S. Ct. 749 (1966); *Tenney v. Brandhove*, 341 U.S. 367, 376, 95 L. Ed. 2d 1019, 71 S. Ct. 783 (1951).

The majority's single focus analysis of legislative immunity under Article 2, § 22 of the Kansas Constitution is flawed and has led it to an erroneous conclusion. First the majority incorrectly assumes that there is a common-law doctrine of legislative immunity and Kansas legislators have immunity from prosecution equivalent to the protection federal legislators receive under the Speech or Debate Clause of Article I, § 6 of the United States Constitution. Second, the majority fails to consider the significance of the historical difference in the evolution of the United States and Kansas Constitutions and fails to review the records and minutes of the Wyandotte Constitutional Convention to ascertain the intent of the drafters of the Kansas Constitution. Last, the majority does not apply the Kansas rules of constitutional construction.

## Common Law

The common law became effective in Kansas when the organic act for statehood was passed in 1855. The common law includes those principles, usages, and rules of action applicable to the government and security of persons and property which do not rest for their authority upon any express or positive statute or our written constitution, but upon statements of principles found in the decisions of the courts. *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, Syl. ¶ 4, 789 P.2d 541 (1990), overruled in part on other grounds 248 Kan. 824, 844, 811 P.2d 1176 (1991).

In Kansas, the common law does not survive if it conflicts with our state constitution or legislative enactments. K.S.A. 77-109 states:

"The common law as modified by constitutional and statutory law, judicial decisions, and the conditions and wants of the people, shall remain in force in aid of the General Statutes of this state; but the rule of the common law, that statutes in derogation thereof shall be strictly construed, shall not be applicable to any general statute of this state, but all such statutes shall be liberally construed to promote their object."

The majority erroneously determines that the common law doctrine of legislative immunity and Article 2, § 22 of the Kansas Constitution provide Kansas legislators protection equivalent to the protection federal legislators receive under Article I, § 6 of the United States Constitution. It assumes the protection under Article 2, § 22 of the Kansas Constitution is similar because it is based on the same origin and rationale as the United States Constitution. For authority, the majority cites *State ex rel. Stephan v. Kansas House of Representatives*, 236 Kan. 45, 54, 687 P.2d 622 (1984), and then proceeds to use as authority federal cases that analyze the United States Constitution.

Article 1, § 6 of the United States Constitution recognizes the need for protection of legislative independence in a governmental system of separation of powers, a theme long found in English law. The English Bill of Rights of 1689 provided: "That the freedom of speech and debates or proceedings in Parliament, ought not to be impeached or questioned in any court or place out of Parliament." 1 W. & M., Sess. 2, ch. 2. The language of this clause finds direct kinship in the English Bill of Rights of 1689. As the United States Supreme Court explained in *United States v. Johnson*, 383 U.S. 169, 178, 15 L. Ed. 2d 681, 86 S. Ct. 749 (1966):

"This formulation of 1689 was the culmination of a long struggle for parliamentary supremacy. Behind these simple phrases lies a history of conflict between the Commons and the Tudor and Stuart monarchs during which successive monarchs utilized the criminal and civil law to suppress and intimidate critical legislators. Since the Glorious Revolution in Britain, and throughout United States history, the privilege has been recognized as an important protection of the independence and integrity of the legislature. . . . In the American governmental

structure the clause serves the additional function of reinforcing the separation of powers so deliberately established by the Founders."

In *United States v. Brewster*, 408 U.S. 501, 33 L. Ed. 2d 507, 92 S. Ct. 2531 (1972), the United States Supreme Court observed that it was important to note that the English system of government differs from ours in that the English Parliament was the supreme authority, and not a separate branch. The *Brewster* Court pointed out that the United States Constitution's Speech or Debate privilege was designed to preserve legislative independence, not supremacy. 408 U.S. at 508. It noted that the clause provides protection of speech in Congress by immunizing United States Senators or Representatives engaged in legislative functions from civil or criminal suit. It observed, however, that some restraints on the conduct of federal legislators remain, for application of the privileges of the clause has been limited through narrow judicial interpretation.

The *Brewster* Court also observed that it has never seriously been contended that political matters such as giving assistance in securing government contracts, preparing news releases, and delivering speeches outside Congress, however appropriate, have the protection afforded by the Speech or Debate Clause. 408 U.S. at 512. It then noted that a careful examination of the decided cases reveals that the Court has regarded the protection from criminal prosecution as reaching only those things " 'generally done in a session of the House by one of its members in relation to the business before it,' " or things " 'said or done by him, as a representative, in the exercise of the functions of that office.' " 408 U.S. at 512-13.

Under Article 2, § 1 of the Kansas Constitution, a governmental sovereign power is vested in the legislature, except such as is granted to the other branches of government, or expressly withheld from the legislature by constitutional restrictions. It is the primary duty of the courts to safeguard the declaration of rights and remedies guaranteed by constitutional provisions. *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, Syl. ¶¶ 1, 2.

Article 2, § 22 of the Kansas Constitution provides:

"**Legislative immunity**. *For any speech, written document or debate in either house, the members shall not be questioned elsewhere.* [Speech or Debate Clause] No member of the legislature shall be subject to arrest—except for treason, felony or breach of peace—in going to, or returning from, the place of meeting, or during the continuance of the session; neither shall he be subject to the service of any civil process during the session, nor for fifteen days previous to its commencement. (Arrest Clause)"

*State ex rel. Stephan v. Kansas House of Representatives,* 236 Kan. at 54, is the only case decided by this court interpreting the Kansas Constitution Speech or Debate Clause. *Stephan* did not involve legislative immunity from criminal prosecution. *Stephan* was a civil action in quo warranto and mandamus brought by the State against the individual members of the Kansas House of Representatives and the Kansas Senate, and the Kansas Governor, seeking a determination of the constitutionality of K.S.A. 1983 Supp. 77-426(c) and (d). That statute allowed the legislature to adopt, modify, or revoke administrative rules and regulations by concurrent resolutions passed by the legislature without presentment to the governor. The legislature filed a motion to dismiss the action, alleging that the common-law doctrine of legislative immunity embodied in the Speech or Debate Clause of the Kansas Constitution protected legislators from civil liability while performing a legitimate legislative function. The issue was whether the legislature was subject to a civil action brought on behalf of the State to determine the constitutionality of its action alleged to violate the doctrine of separation of powers by usurping the authority of the executive branch to administer and enforce laws.

The *Stephan* court found that the purpose of the Speech or Debate Clause of the Kansas Constitution was to insure that legislators may perform legislative functions independently, free from outside interference or fear of such interference and the burden of defending themselves in civil actions. 236 Kan. at 54-55 (citing *Supreme Court of Va. v. Consumers Union,* 446 U.S. 719, 731-32, 64 L. Ed. 2d 641, 100 S. Ct. 1967 [1980]). The *Stephan* court noted that the United States Supreme Court had stated that " 'the "central role" of the Clause is to "prevent intimidation of legislators by the Executive and accountability before a possible hostile judici-

ary." [As such,] the Clause provides protection against civil as well as criminal actions, and against actions brought by private individuals as well as those initiated by the Executive Branch.' " 236 Kan. at 56 (quoting *Eastland v. United States Serviceman's Fund*, 421 U.S. 491, 502-03, 44 L. Ed. 2d 324, 95 S. Ct. 1813 [1975]). The *Stephan* court found that legislative immunity was not written into the Kansas Constitution for the purpose of protecting the private or personal benefits of legislators. Rather, immunity was provided to " ' "protect the integrity of the legislative process by insuring the independence of individual legislators." ' " 236 Kan. at 55 (quoting *Eastland*, 421 U.S. at 502-03, quoting *Brewster*, 408 U.S. at 507.

### Intent of the Drafters of the Kansas Constitution

The essential difference between a constitution and a statute is that a constitution usually states general principles or policies and establishes a foundation of law and government, whereas a statute must provide the details of the subject of the statute. A constitution, unlike a statute, is intended not merely to meet existing conditions but to govern future contingencies. *State ex rel. Stephan v. Finney*, 254 Kan. 632, Syl. ¶ 2, 867 P.2d 1034 (1993).

The Constitution of the United States was framed in Philadelphia in 1787 by a Constitutional Convention. It was adopted and signed on September 17, 1787, by representatives of all of the original states except Rhode Island. The meeting of the representatives writing the proposed Constitution was closed, and official minutes were not published. The debates for ratification of the Constitution were held in each state and published in a series of articles known as the Federalist Papers. Eleven states ratified the Constitution by August 1788, and the Constitution became effective on that date. Since its ratification, the federal courts have been required to interpret the United States Constitution because of the vagueness of certain broad clauses and the lack of a historical record to indicate what its framers intended.

The United States Supreme Court has decided few cases concerning the construction, scope, and interpretation of the Speech or Debate Clause of the Constitution. A majority of the cases dealt with civil liability of members of Congress, their staff, or employees

of Congress, not immunity for criminal acts committed on the House or Senate floor. In its analysis, the majority in this case reviews four United States Supreme Court cases which address the Speech or Debate Clause: *United States v. Helstoski*, 442 U.S. 477, 61 L. Ed. 2d 12, 99 S. Ct. 2432 (1979); *Gravel*, 408 U.S. 606; *Brewster*, 408 U.S. 501; *Johnson*, 383 U.S. 169. Some of the cases do not apply to immunity from criminal prosecution. Except for *Johnson*, where the Court discussed the Speech or Debate Clause immunity from criminal charges for crimes committed on the legislative floor, the discussion was mere dicta.

In *Johnson*, a former Congressman was convicted in the United States District Court for the District of Maryland on seven counts of violating the federal conflict of interest statute, 18 U.S.C. § 281, and on one count of conspiring to defraud the United States in violation of 18 U.S.C. § 371. At the trial, there was evidence, as well as argument by counsel, relating to the authorship, content, and motivation of a speech which the defendant allegedly made on the floor of the House of Representatives in pursuance of a conspiracy designed to give assistance, in return for compensation, to certain savings and loan associations indicted on mail fraud charges. The 4th Circuit Court of Appeals set aside the conspiracy count, holding the Government's conspiracy allegation was barred by Article I, § 6. On *certiorari*, the United States Supreme Court affirmed, stating the prosecution on the conspiracy count, being dependent upon an intensive inquiry with respect to the speech on the floor of the House, violated the Speech or Debate Clause of Article 1, § 6 so as to warrant the granting of a new trial on the conspiracy count, with all elements offensive to the Speech or Debate Clause to be eliminated. 383 U.S. at 185.

In applying the federal rationale of these cases to the Kansas Constitution, it is important to note that all four cases discussed in the majority opinion were decided subsequent to the adoption of the Kansas Constitution. The drafters of the proposed Kansas Constitution could not have been aware of or influenced by these later federal court decisions.

We are interpreting the Kansas Constitution. This court not only has the authority, but also the duty, to construe the Kansas Con-

stitution within the apparent intent of those who adopted it. *State v. Durrant*, 244 Kan. 522, 534, 769 P.2d 1174, *cert. denied* 492 U.S. 923 (1989). Although the Speech or Debate Clause of Article 2, § 22 of the Kansas Constitution has historic roots in English history and Article I, § 6 of the United States Constitution, it must be interpreted in light of the Wyandotte Constitutional Convention and in the context of the Kansas constitutional scheme of government.

Our constitution is a written charter enacted by the direct action of the citizens of Kansas. It is a compilation of the fundamental laws of the state and embodies the principles upon which the state government was founded. The object of our constitution is to provide a government of laws and not of men, while insuring the protection of life, liberty, and property. *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. at, 347-48. Unlike the United States Constitution, which was drafted in a closed convention without official minutes, the Wyandotte Constitutional Convention was open and the official minutes were published. The elected delegates assembled at Wyandotte on the first Tuesday of July 1859 to form a constitution and provide for the organization of a state government for the State of Kansas. Several standing committees were appointed to draft the several subdivisions of the constitution for consideration by the convention in adopting the Kansas Constitution. The various standing committees included committees for the executive department, the legislative department, and the judicial department. Minutes were kept of the committee report and published as *The Wyandotte Constitutional Convention*.

At the afternoon session of Tuesday, July 12, 1859, on motion by Mr. Thacher, the general order of reports from standing committees was taken up. Mr. Thacher, from the committee on the legislative department, submitted the following report as to Article 2, § 22:

"For any speech or debate in either house the members shall not be questioned elsewhere. No member of the Legislature shall be subject to arrest, except for a felony or breach of the peace, in going to or returning from the place of meeting, or during the continuance of the session, neither shall he be subject to the service of any civil process during the session, nor for fifteen days previous to its com-

mencement." Proceedings and Debates Embracing the Secretary's Journal of the Kansas Constitutional Convention, p. 114.(1920).

In the afternoon session of Wednesday, July 13, 1859, on motion by Mr. Slough, the Convention resolved into a Committee of the Whole—Mr. Hipple in the Chair—and resumed the consideration of the report of the committee on the legislative department—the question pending being on the adoption of Article 2, § 22.

Mr. Brown offered the following as a substitute:

"For any speech or debate, in either house the members shall not be questioned elsewhere, nor shall any word or words spoken in debate in either house of the Legislature be the foundation of any action, complaint or prosecution. No member of the Legislature shall be subject to arrest, except for a felony or breach of the peace, in going to or returning from the place of meeting, or during the continuance of the session, nor for fifteen days previous to its commencement." Proceedings and Debates, p. 135.

Ordinarily there is a presumption that a change or a refusal to change the language of the constitution results from the framers' purpose to change or the refusal to change its effect. *Cf. In re Marriage of Schuhs*, 20 Kan. App. 2d 98, 99, 883 P.2d 1225 (1994), *rev. denied* 257 Kan. 1092 (1995) ("Ordinarily, there is a presumption that a change in the language of a statute results from the legislative purpose to change its effect."). The substitute amendment, if adopted, would have granted legislators unlimited immunity and prohibited any word or words spoken in debate in either house of the legislature from being the foundation of any action, complaint, or prosecution. The proposed amendment offering unlimited immunity for any word or words spoken in either house of the legislature was rejected, and the section passed without the amendment. See Proceedings and Debates, p. 135.

The defeat of Brown's substitute wording shows that the framers of the Kansas Constitution believed in a narrow and restrictive view of legislative immunity and certainly not the broad and expansive view which is taken by the majority.

### Kansas Rules of Constitutional Construction

It is the function and duty of the Kansas Supreme Court to define constitutional provisions. The definition should achieve a

consistency so that it shall not be taken to mean one thing at one time and another thing at another time. The nature of the judicial process is that the construction becomes equally as controlling upon the legislature of the state as the provisions of the constitution itself. *State ex rel. Stephan v. Finney*, 254 Kan. 632, Syl. ¶ 4.

The difficulty for the majority in reaching a logical conclusion is that neither the Kansas case nor the federal cases cited by the majority define or interpret what is "speech," "debate," or "the criminal activity" protected by the immunity clause. This difficulty is compounded because the majority fails to note the distinction between words or phrases having legal significance and common words. "Arrest," "prosecution," "felony crimes," and "breach of the peace" are words or phrases having legal significance and are defined in Black's Law Dictionary (6th ed. 1990). "Speech" and "debate" are common words and are not defined in Black's Law Dictionary (6th ed. 1990).

When construing the Kansas Constitution or a statute, a court should give words in common usage their natural and ordinary meaning. See *Bank IV Wichita v. Plein*, 250 Kan. 701, 705-06, 830 P.2d 29 (1992). When a section of the constitution is plain and unambiguous, the court must give effect to the intention of the framers as expressed, rather than determine what the law should or should not be. See *State v. Gonzales*, 255 Kan. 243, 249, 874 P.2d 612 (1994); *Martindale v. Tenny*, 250 Kan. 621, Syl. ¶ 2, 829 P.2d 561 (1992). Applying the rules of statutory construction to the Kansas Constitution, it is presumed the framers of the constitution understood the meaning of the words they used and intended to use them and that the framers used the words in their ordinary and common meaning. See *Bank of Kansas v. Davison*, 253 Kan. 780, 788, 861 P.2d 806 (1993).

"Speech" is defined as the faculty or act of expressing or describing thoughts, feelings, or perceptions by the articulation of words. It is also defined as a public address and described as a lecture, oration, talk, the core meaning; a formal oral communication to an audience. Webster's II New Riverside University Dictionary 1117 (1988).

"Debate" is defined as to consider or deliberate; to engage in an argument by discussing opposing points; to engage in a formal discussion or argument; and a formal contest of argumentation in which two opposing teams defend and attack a given proposition. Webster's II New Riverside University Dictionary 351 (1988).

"Blackmail" is gaining or attempting to gain anything of value or compelling another to act against such person's will, by threatening to communicate accusations or statements about any person that would subject such person or any other person to public ridicule, contempt, or degradation. Blackmail is a severity level 7, nonperson felony. K.S.A. 21-3428.

The discussions among Neufeld, Alldritt, and McKechnie were not public addresses or debates among the members of the House of Representatives. Instead, in order to be effective, the threats to influence the votes were communicated in a secretive manner. Accordingly, blackmail is not speech or debate, nor does it relate to a legitimate legislative function. The crime of blackmail is not an integral or essential part of the legislative process. Rather, the crime is only peripherally related to the legislative office and should not be protected from prosecution. See *United States v. Brewster*, 408 U.S. 501, 520, 33 L. Ed. 2d 507, 92 S. Ct. 2531 (1972). Because Neufeld was not making a speech or involved in a debate on the House floor, Article 2, § 22 of the Kansas Constitution does not apply.

The structure of the Kansas government consists of interlocking privileges created by the constitution, legislation, and judicial decisions. Under our form of government, we accept disparate treatment for the different branches of government as normal and commonplace. Under our constitution, each branch of government enjoys advantages or privileges which are not enjoyed by the other two branches. Regardless of the origin of special privileges, the branch which benefits is not above the law and is required to act lawfully.

Our system of government is founded upon the restrictions placed on government by the constitution. The judiciary interprets, explains, and applies the law to controversies concerning rights, wrongs, duties, and obligations arising under the law. The court is

obligated to interpret the constitution and safeguard the basic rights reserved to the people. *U.S.D. No. 380 v. McMillen*, 252 Kan. 451, 461, 845 P.2d 676 (1992).

When a case is decided on grounds of public policy without the benefit of a constitutional declaration from which an influence can be fairly drawn, a court necessarily relies upon its own sense of public policy and community values. Before a court is justified in declaring the existence of public policy in its interpretation of our constitution, the policy should be so thoroughly established as a state of public mind so united and so definite and fixed that its existence is not subject to any substantial doubt. *Dickens v. Snodgrass, Dunlap & Co.*, 255 Kan. 164, Syl. ¶ 7, 872 P.2d 252 (1994).

As I previously stated, courts are called upon to weigh considerations of public policy when adding to the content of the common law, when filling in statutory gaps left by the legislature, and when applying constitutional precepts to vague and broad clauses of the constitution. Of all of the aspects of judicial review, considerations of public policy are compelling or even decisive when balancing the rights and principles involved. In reaching its decision, the majority determines that under Article 2, § 22 of the Kansas Constitution, a legislator has a right to be free from prosecution for criminal blackmail committed on the floor of the House. Under the circumstances, in order to protect the integrity of the legislative process and safeguard the basic rights reserved to the people, a balancing test of competing rights is required. In addition to Neufeld's claim of immunity from criminal prosection, the balancing test to be applied must include the public's expectation of honest government and the right of all legislators to be free from criminal influence when casting a vote for or against proposed legislation.

Legislators are frequently pressured to put aside their personal will and vote in a certain way for special legislation. The purpose of this time-tested tactic for passing special interest legislation is to create a connection between the benefit for the affected interest group and a general benefit for society as a whole. Voting for or against passage of a statute can result in harsh editorials, letters to the editor, negative campaigning, loss of campaign support, or loss

of a coveted chairmanship or committee assignment. This is not an evil; it is the reality of a political system.

However, blackmailing another legislator to cast a vote is obviously no part of the legislative process or function; it is not a legislative act, nor is it, by any conceivable interpretation, an act performed as a part of or even incidental to the role of a legislator. Neither is it an act resulting from the nature and execution of the office, nor is it a thing said or done by a legislator as a representative in the exercise of the functions of a legislator's office. It is not necessary to inquire into a legislative act, or into the motivation for a legislative act, in order to prosecute a member of the legislature for the criminal act of blackmail.

Neufeld's contacts with Alldritt and McKechnie were not in furtherance of legitimate debate of the legislation then pending in the House. The contacts were made to compel Alldritt to vote contrary to his intentions, to cause marital discord, and to encourage Alldritt's wife to ask her husband to change his vote. Article 2, § 22 of the Kansas Constitution was not meant to protect such conduct. The clause is meant to preserve legislative integrity. *State ex rel. Stephan v. Kansas House of Representatives*, 236 Kan. 45, 55, 687 P.2d 622 (1984). Granting protection to Neufeld from prosecution for criminal blackmail poses a threat to legislative integrity because blackmail is contrary to democratic ideals and principles embodied in our constitution.

The majority's vision of government deprives the public of its constitutional right to honest representation by a legislator who is the victim of the blackmail. Forcing a duly elected representative to change his or her vote under criminal threat of blackmail is repugnant to our system of government. It is an illegal act performed not in furtherance of a free and open legislative debate, but in degradation of it. The only reasonable reading of the Speech or Debate Clause of Article 2, § 22 of the Kansas Constitution, consistent with its history and purpose, is that it does not prohibit inquiry into criminal activities occurring on the House or Senate floor, because such conduct is not a part of the legislative process. Conduct such as blackmail or bribery occurring during a session

of the House on the House floor is not protected under Article 2, § 22 of the Kansas Constitution and can be admitted into evidence.

MCFARLAND, C.J., and LARSON, J., join the foregoing dissent.

LARSON, J., dissenting: I agree with and join Justice Lockett's dissent.

I write separately only to express my disagreement with the majority statement that "if the dissent is correct, a legislator may be sued civilly or charged criminally for a word or words spoken in the House or Senate."

The basic premise of Justice Lockett's dissent and my view is that Article 2, § 22 of the Kansas Constitution fully protects all legitimate aspects of speech or debate which are necessary and integral parts of the legislative process. As such, a legislator could *not* be sued civilly or charged criminally while exercising the right to speak freely and debate fully the legislative agenda.

I would not extend the constitutional immunity to protect the type and kind of criminal conduct which Neufeld was alleged to have attempted to perpetrate on a fellow legislator and the citizens of Kansas. Neufeld's alleged actions were repugnant to and did not further the legislative process. He is not entitled to the unfettered constitutional protections which have been bestowed upon him by the majority's opinion.

I would reverse the trial court.

MCFARLAND, C.J., and LOCKETT, J., join the foregoing dissent.